**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and STATE OF FLORIDA *ex rel.* OMNI HEALTHCARE, INC. and JOHN DOE, Plaintiffs, | ) | **Filed *In Camera* and Under Seal** |
| | ) | 4:22-cv-49-MW/MAF |
| v. | ) | |
| | ) | **DO NOT PUT ON PACER** |
| NORTH BREVARD COUNTY HOSPITAL DISTRICT d/b/a PARRISH MEDICAL CENTER; HALIFAX HOSPITAL MEDICAL CENTER; GEORGE MIKITARIAN; CHRISTOPHER McALPINE; ANUAL JACKSON, SR.; ERIC PEBURN; and JEFF FEASAL, | ) | |
| Defendants. | ) | |

***QUI TAM* COMPLAINT**

**INTRODUCTION**

1. Relators bring this action under the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA"), the Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.* and the Stark Act, 42 U.S.C. § 1395nn ("Stark"). in order to recover damages and civil penalties on behalf of the United States and the State of Florida arising from false claims and fraudulent statements, records and claims made by Defendants . The allegations involve Florida's Low Income Pool ("LIP") program, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), and Defendants' violation of Stark. The LIP Program is used to pay providers for the cost of care given to the most vulnerable patients, and the CARES Act is a $2.2 trillion economic stimulus

FILED USDC FLND TL
FEB 1 '22 PM2:43
SJB

bill signed into law in 2020. The LIP program first was implemented by the Medicaid managed care program in 2005. LIP provides direct payments to safety-net providers with the purpose of providing health care services to Medicaid, underinsured and uninsured patients. The CARES Act aims to providing relief for individuals and businesses that have been negatively impacted by the coronavirus ("COVID") outbreak. The CARES Act does not allow physician groups to receive money from the Government for services that have already been covered by other COVID relief programs. The Stark Amendment makes it illegal for hospitals to compensate referring physicians based on the value and volume of referrals for designated health services.

2. As explained in greater detail herein, Relators allege Defendants colluded to defraud the LIP program and the CARES Act, and, in doing so, submitted false and/or fraudulent claims for payment to the United States and the State of Florida. Defendants also violated the Federal Stark Law by paying physicians commercially unreasonable compensation in exchange for referrals. The physicians' compensation was not based on fair market value. In doing so, Defendants submitted false claims to the United States for payment for each tainted claim.

3. The FCA provides that any person who knowingly submits or causes to be submitted to the Government a false or fraudulent claim for payment or approval is liable for a civil penalty of $10,781 to $21,563 for each such claim, as well as three times the amount of the damages sustained by the Government. The FCA permits persons having information regarding a false or fraudulent claim that was submitted to the Government to bring an action on behalf of the Government and to share in any recovery. The complaint must be filed under seal, without service on the defendants. The complaint remains under seal while the Government conducts an investigation of the complaint's allegations and determines whether to join the action.

4. Pursuant to the Federal FCA and the State of Florida's FCA, and on behalf of the

United States and the State of Florida, Relators seek to recover damages and civil penalties arising from Defendants' purposeful submission of false and/or fraudulent claims to the Government.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367 and 31 U.S.C. § 3732.

6. This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. §3732(a) because Defendants transact business in the Northern District of Florida.

7. Venue is proper in this District pursuant to 31 U.S.C. §3732(a) because Defendants can be found in, reside in and/or have transacted business in the Northern District of Florida.

8. Relators know of no other FCA complaints that have been filed against Defendants alleging the same or similar actions for the time period at issue. Additionally, Relators are original sources as defined in 31 U.S.C. § 3730(e)(4)(B). Relators made voluntary disclosures to the United States prior to the filing of this lawsuit.

## PARTIES

9. The United States and the State of Florida are the real parties of interest in this action.

10. Relator Omni Healthcare, Inc. ("Relator" or "Omni") is a multi-specialty physician group based in Brevard County, Florida. Relator operates in central Florida and specializes in the fields of internal medicine, surgery, pediatrics, family practice and many medical and sub-specialties. The facts alleged within are based on the personal observation of

Relator Omni's principal, as well as documents and information in his possession. The information and observations led Relator to question Defendants' fraudulent actions.

11. Relator John Doe is an executive at Relator Omni Healthcare.

12. Defendant North Brevard County Hospital District d/b/a Parrish Medical Center ("Parrish") is an independent special taxing district located in the northern portion of Brevard County. The District operates a 210-bed not-for-profit community hospital, an affiliated medical group and related support services, including clinics, home health services, a cancer center, a health and fitness center and various outpatient healthcare facilities. The District also has operations in Port St. John and Port Canaveral.

13. Defendant Halifax Hospital Medical Center is a legislatively-chartered taxing healthcare organization governed by a Board of Commissioners appointed by the Governor of Florida.

14. Defendant George Mikitarian has been President and Chief Executive Officer of the North Brevard Hospital District since January 2001. He supervises, directs and approves operations in the District.

15. Defendant Anual Jackson, Sr. has been the Chief Corporate Compliance and Privacy Officer at the District since 2012. His responsibilities include ensuring that the District operates in a legal and ethical manner.

16. Defendant Christopher McAlpine is the District's Chief Transformation Officer and a Senior Vice President. McAlpine is responsible for strategic planning, business development and strategy at the District.

17. Defendant Eric Peburn is the Executive Vice President and Chief Financial

Officer of Halifax Hospital Medical Center. He joined Halifax in 1996, and was promoted to his current position in 2007.

18. Defendant Jeff Feasal has been the President and Chief Executive Officer of Halifax since January 2005. During his tenure, Halifax has expanded its services throughout the three-county area in which it now operates. Under his leadership, Halifax contracted with Parrish to provide a wide array of services, including information technology and finance. During his tenure, in 2014, Halifax settled a False Claims Act complaint in the amount of $85 million.

**The Federal and Florida False Claims Acts**

19. The Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* reflects Congress' objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345 at 1 (1986). As relevant to this case, the FCA establishes liability for an individual or entity that:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (C) conspires to commit a violation of 31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B); and
>
> (D) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1)(A); 31 U.S.C. § 3729(a)(1)(B); 31 U.S.C. §(a)(1)(C); 31 U.S.C. §(a)(1)(G).

20. The FCA defines "knowing" and "knowingly" to mean that a person (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1). No proof of specific intent to defraud is required and an innocent mistake is not a defense to an action under this act. *Id.*

21. In addition to treble damages, the FCA provides for civil penalties for each violation.

22. The State of Florida's FCA is modeled after the Federal FCA, and contains provisions similar to the ones quoted above. Relators assert claims under the FCA and the State of Florida's FCA for the false and fraudulent claims alleged in this Complaint.

**The Stark Act**

23. The Stark Act, 42 U.S.C. § 1395nn, states that if a physician or member of his immediate family has a "financial relationship" with an entity providing healthcare services:

> (a) the physician may not make a referral to the entity for the furnishing of designated health services...and
>
> (b) the entity may not present or cause to be presented a claim under this subchapter or bill any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A),

42 U.S.C. § 1395nn(a)(1).

24. The regulations implementing the Stark Act state that a "financial relationship" may include "a direct or indirect compensation arrangement . . . with an entity that furnishes

[designated health services]." 42 C.F.R. § 411.354(a)(1)(ii). A "compensation arrangement" can be "any arrangement involving remuneration, direct or indirect, between a physician . . . and an entity." *Id.* at § 411.354(c).

**Violations of Stark Can Form the Basis of FCA Liability**

25. Compliance with Stark is a precondition for payment from Medicare.

26. An express or implied certification accompanies each claim submitted to Medicare for reimbursement of health services provided to beneficiaries that the transaction is not in violation of federal or state statutes, regulations, or program rules. Falsely certifying compliance with Stark in connection with a claim submitted to a federally-funded health care program is actionable under the FCA.

**The Low Income Pool Program**

27. On October 19, 2005, the Centers for Medicare and Medicaid Services ("CMS") approved the 1115 Research and Demonstration Waiver Application for the State of Florida, relating to Medicaid reform. The Florida Legislature passed House Bill ("HB" 3B on December 8, 2005, authorizing implementation of the waiver effective July 1, 2006. In the Waiver Special Terms and Conditions ("STC"), the LIP is "established to ensure continued government support for the provision of health care services to Medicaid, underinsured and uninsured populations. The low income pool consists of a capped annual allotment of $1 billion total computable for each year of the 5-year demonstration period." The parameters of LIP are defined in STCs 91-106.

28. STC Number 94 states that "LIP funds may be used for health care expenditures (medical care costs or premiums) that would be within the definition of medical assistance in Section 1905(a) of the Act. These health care expenditures may be incurred by the State, by

hospitals, clinics, or by other provider access systems ("PAS") and insurance products for such services provided to otherwise uninsured individuals, as agreed upon by the State and CMS."

29. In accordance with STCs Numbers 93 and 100, the State submitted to CMS on June 26, 2006, the first Reimbursement and Funding Methodology document (RFMD) for LIP expenditures, which includes the definition of expenditures eligible for Federal Matching funds under the LIP and entities eligible to receive reimbursement. The STCs together with the Reimbursement and Funding Methodology document govern the LIP program.

**The CARES Act**

30. The CARES Act was enacted for the purpose of providing fast and direct economic assistance for American workers, families, small businesses and industries. It was passed by Congress and signed into law on March 25, 2020 and signed into law on March 27, 2020. At over $2 trillion, it is one of the largest rescue packages in U.S. history. The law allocated $150 billion to states and localities battling the pandemic and $130 billion more for the healthcare system.

31. According to the Terms and Conditions set forth by the Department of Health and Human Services ("HHS"), in order for a business to participate in the CARES Act program, "the Recipient certifies that it will not use the Payment to reimburse expenses or losses that have been reimbursed from other sources or that other sources are obligated to reimburse."

**ALLEGATIONS**

**Overview and Background**

32. Florida created the LIP program to pay providers for the cost of care given to the State's most vulnerable patients. The creation of LIP was done in conjunction with the State's implementation of the Medicaid managed care program in 2005. LIP provides direct payments to

safety-net providers for the provision of health care services to Medicaid patients, as well as to underinsured and uninsured patients.

33. These supplemental payments flow to county health departments, Federally Qualified Health Centers ("FQHCs") and other safety-net providers from a federal program. Contributions from local and state governments match the federal money. Together, the federal, local and state aid to Florida's safety-net healthcare providers initially totaled $1 billion per year. This year, it amounts to more than $1.9 billion.

34. Each year, hospitals, health departments and FQHCs pledge hundreds of millions of dollars to the state Agency for Health Care Administration ("AHCA"). AHCA uses the contributions to draw federal money. The Agency tells the providers they will never receive less than the amount they contributed. In 2016-2017, for example, a contribution of 39 cents returned $1.

35. AHCA requires local government contributors to complete a LIP agreement that spells out their financial commitment, the program rules, the proper use of the aid, audit procedures and record keeping. The healthcare agency bills contributors who must transmit the money by Intergovernmental Transfer ("IGT"). A summary of the program explains:

> Since many health care facilities benefit from IGT funds used for federal match, IGT providers are encouraged to contribute funds in order to ensure maximum payments from the LIP program. Health care providers are encouraged to contact potential IGT providers in their area to secure IGT funding.

36. Florida agreed it would not receive any federal money in excess of allowable costs and that CMS may recoup any overpayments. To comply, AHCA required recipients to calculate a LIP Cost Limit, submit reports detailing the uncompensated care provided and undergo an audit to reconcile the payments. Overpayments for any unallowable costs are

supposed to be returned to CMS. AHCA has been repeatedly criticized for failing to provide adequate oversight and guidance for the LIP program.

37. CMS conducted two Financial Management Reviews of the LIP program covering [state fiscal years] 2007 through 2009 and found that the State agency [AHCA] did not provide hospitals with adequate oversight and guidance. As a result, the hospitals claimed unallowable costs and inconsistently documented, calculated and reported costs.

38. AHCA is supposed to reconcile the LIP payments made to recipients with money provided to these hospitals through other federal and state aid programs that care for the state's poorest and most vulnerable patients, such as Medicaid and the Disproportionate Share Hospital Payments ("DSH").

**Legal History Involving CMS, Florida and AHCA**

39. From state fiscal year 2007 through 2014, CMS disallowed $146.1 million of federal funds related to LIP overpayments that AHCA did not refund. In an April 14, 2015 letter to Florida, CMS wrote:

> … over time, CMS has had a number of concerns about the LIP [Low Income Pool], including its lack of transparency, encouragement toward overreliance on supplemental payments and distribution of funds based on providers' access to local revenue instead of service to Medicaid patients.

40. As a result of the financial risk uncovered by CMS, the HHS Office of Inspector General ("OIG") audited the LIP program costs and expenditures for the state's largest recipient, Jackson Memorial Hospital in Miami.

41. In August 2019, it recommended Florida return $412 million. Two years earlier, in January 2017, CMS demanded Florida return $97 million in LIP overpayments because the hospitals did not properly offset money received from other federal healthcare programs. Florida

challenged the decision. An HHS appeals board upheld the CMS decision to disallow the money in February 2021.

42. On April 27, 2017, AHCA sued HHS in the U.S. District Court in the Southern District of Florida. U.S. District Court Judge Beth Bloom ultimately closed the case for administrative purposes pending settlement discussions.

43. Florida's reconciliation of LIP payments—the review designed to ensure costs are justified—is deficient. For example, the 2017 fiscal year examination, demonstration year 11, has yet to be completed.

## Introduction of Halifax

44. After AHCA's reconciliation for the LIP demonstration year 9 ("DY"), which ended on June 30, 2015, the Halifax Hospital Medical Center Taxing District, d/b/a Halifax Health offered an adjacent hospital district an opportunity for a quick profit with little risk.

45. The controller for the North Brevard County Hospital District, d/b/a Parrish Medical Center, summarized the 2017 proposal in a one-page memo to the Board of Directors:

> The primary purpose of the interlocal agreement is to obtain $200,000 in increased Medicaid funding under the Low Income Pool (LIP) program.
>
> The benefit to Halifax is to relieve it of excess LIP funds it would otherwise owe by designating LIP payments to other public hospitals. The Arrangement will be submitted to the Florida Agency for Health Care Administration (AHCA) to transfer LIP funds in their records.
>
> Under the interlocal agreement, PMC will receive a wire transfer from Halifax in the amount of $4,434,000. PMC will then transfer $4,234,000 to an account identified by Halifax. PMC will remain the difference of $200,000 for providing care to Medicaid, underinsured and uninsured individuals.

46. On November 13, 2017, the two public hospitals memorialized the deal in a five-

page agreement filed with the Brevard County Clerk of Court. The agreement describes the three-step process the two hospital taxing districts used to manipulate the LIP program so Halifax would not have to repay $4 million.

**Violation of Federal Rules and Regulations**

47. Halifax agreed to reduce its contribution to the LIP program by $4 million and redirected the money to Parrish's benefit. The reallocation decreased the DY9 LIP payments earmarked to Halifax by $4,340,000. It also added $4,340,000 to the LIP distribution Parrish would receive. The transaction effectively removed any LIP overpayment to Halifax.

48. After AHCA approved the reallocation, Halifax agreed to wire transfer $4,340,000 to a PMC account. PMC agreed to return $4,140,000 to Halifax immediately, and then pocketed $200,000.

49. The agreement with AHCA requires LIP recipients to use the supplemental aid to increase the provision of health services for charity care. The letter of agreement said:

> The [IGT Provider] and the Agency have agreed that these IGT funds will only be used to increase the provision of health services for charity care of the [IGT Provider] for the State of Florida at large.
>
> The increased provision of charity care health services will be accomplished through . . . LIP payments to hospitals, federally qualified health centers, Medical School Physician Practices, and rural health centers pursuant to the approved Centers for Medicare & Medicaid Services Special Terms and Conditions.

50. The special terms and conditions of the LIP program explicitly state LIP funds "may be used for health care costs—medical care costs or premiums—that would be within the definition of medical assistance in Section 1905(a) of the ACT."

51. The RFMD provides instructions for calculating the LIP cost limits for hospitals. For DY9, a reconciliation must take place based on the CMS-2552 cost report. The instructions explained:

> If, at the end of the interim reconciliation process, it is determined that a hospital received an overpayment, the overpayment will be properly credited to the Federal government.

52. Parrish violated federal law when it accepted, but did not use, the entire additional LIP allotment of $4,340,000 to care for the Medicaid, underinsured and uninsured patients. Instead, it earmarked $200,000 to provide care for Medicaid, underinsured and uninsured patients. It transferred the remainder-- $4,140,000—to Halifax. Neither the agreement nor the memorandum from then-controller Michael Sitowitz describes any restriction on the use of the money sent from Parrish to Halifax. These agreements do not say the money must be used for charitable care.

**Halifax Holds Parrish Harmless**

53. Parrish made sure its legal interests were protected. Sitowitz explained in an October 31, 2017 memorandum to the Board of Directors:

> The inter-local agreement provides that Halifax will indemnify PMC for any loss associated with the transaction. The risk of loss for this agreement is very low.

54. The inter-local agreement includes a provision wherein Halifax agrees to indemnify, defend and hold harmless Parrish.

55. Two years later, Parrish and Halifax signed a second agreement designed to manipulate the LIP supplemental funding program for the period covering waiver DY9. In a December 10, 2019 interlocal agreement, Halifax re-designated $1.5 million to Parrish's benefit.

The reallocation decreased Halifax's LIP share and increased Parrish's LIP share by $1,627,500. Parrish agreed to transfer $1,527,500 and pocket $100,000.

56. Again, Parrish accepted, but did not use, $1,557,500 from the LIP program for care of the area's vulnerable in violation of federal law and its agreement with Florida.

57. The agreement indemnifying Parrish states:

> Halifax covenants and agrees to the extent permitted by law, it shall indemnify, defend and hold harmless PMC [Parrish] and its officers, directors, employees and agents from and against any and all losses, obligations, costs, liabilities, damages, actions, suits, causes of action, claims, demands, settlements, judgements or other expenses, which are asserted against, imposed on, or incurred or suffered by, such indemnified party and which arise out of or result from this Agreement.

58. Under both its arrangements with Halifax, Parrish accepted kickbacks in exchange for circumventing the regulations governing a federal program that provides supplemental funds to care for the uninsured and underinsured. Parrish agreed to the deal despite questions raised internally over whether the arrangement was legal.

59. Halifax is in an independent special district, a unit of government created for a particular purpose with jurisdiction within a limited geographic boundary. In Florida, these districts have only those powers expressly provided by, or reasonably implied from, the authority in their charters. They provide specific municipal services in addition to, or in place of, those provided by a municipality or a county in a specific geographic area.

**<u>No Authority to Participate</u>**

60. In 2017, Halifax's charter limited its operations to a portion of Volusia County. Legally, it did not have the authority to operate outside of its district boundaries, including contracting through inter-local agreements with other government units outside its area.

61. Inter-local agreements "permit local government units to make the most efficient

use of their powers by enabling them to cooperate with other localities to provide services and facilities in a manner pursuant to forms of governmental organization that will accord best with geographic, economic, population and other factors influencing the needs and development of local communities." It is intended to authorize the entry into contracts for the performance of service functions of public agencies.

62. The North Brevard County Hospital District, d/b/a/ Parrish Medical Center, was created as a special taxing district expressly for the purpose of equipping, maintaining and operating a hospital in northern Brevard County. Its enabling legislation permits the District to enter into joint ventures with not-for-profit and for-profit health care ventures operating within and beyond its geographic boundaries.

63. However, the law expressly prohibits the District from using money derived from ad valorem taxes to support any healthcare facility or service operated outside the District's boundaries. (See Section 23) The law does not allow the District to purchase stock in such corporations and requires compliance with the Florida Constitution and general laws.

Section 10 of the Florida Constitution says, in part:

> Neither the state nor any county, school district, municipality, special district, or agency of any of them, shall become a joint owner with, or stockholder of, or give, lend or use its taxing power or credit to aid any corporation, association, partnership or person …

64. Despite the prohibitions, Parrish holds investments in two corporate entities selling health care services to patients inside and outside the District's legislatively-set geographic boundaries.

65. LHCG LXXXII, LLC, a hospice and home health care company, operates in

Brevard County as Parrish Home Health Care. LHCG is a subsidiary of LHC Group Inc. of Lafayette, Louisiana, a national provider of in-home healthcare services with operates in 37 states and 30,000 employees.

66. LHC Group advertises itself as the "preferred in-home healthcare partner for more than 400 leading hospital around the country." Last year, LHC Group recorded $2.1 billion in revenue and net income of $111.6 million. (See Page 45)

67. Florida health care records identify the owners of LHCG as LHC Health Care Group of Florida LLC, another subsidiary of LHC Group, and North Brevard Medical Support Inc. LHC Health Care Group owns 75 percent of the company. North Brevard Medical Support owns 25 percent.

68. North Brevard Medical Support (NBMS) is a not-for-profit, non-stock corporation and blended unit of the District. (See Page 16) According to the District's tax returns, NBMS was created "solely to benefit (See Page 16) and further the interests of the District through physician recruitment and the provision of medical goods and services." The hospital taxing district pays millions of dollars to subsidize (See Page 9) the operations of NBMS.

69. Parrish Home Health operates numerous location in Brevard, including the county's second largest city, Melbourne. Melbourne is outside the geographic boundaries of the North Brevard Hospital District.

70. George Mikitarian, the president and CEO of Parrish, described the District's investment in a second for-profit company, MedFast Urgent Care Centers, to Relator John Doe. MedFast runs the largest urgent care network in Brevard County. Its 14 centers span the county, operating both inside and outside the geographic boundaries of the District. MedFast has three centers in Melbourne alone.

71. Parrish spent $1.1 million on a 7,000-square-foot-urgent-care facility on Port St. John Parkway in a venture with MedFast Urgent Care Centers LLC. Dr. David Williams, a MedFast partner, said at the time the company would like to be the "McDonald's of urgent-care medicine – serve it fast and efficiently."

72. Since the venture with Parrish was announced, MedFast has built 12 facilities across the county and has announced plans for two more.

## The CARES Act

73. Congress allocated $150 billion to state, local and tribal governments to help pay the increased expenses caused by COVID-19. Other aid packages directed billions of dollars to loans for small businesses, hospitals and health care providers. Florida government alone received $8.3 billion with the state's 12 largest counties allocated $2.5 billion.

74. The CARES Act authorized elected county officials to direct money to cover any "necessary expenditures" incurred due to the public health emergency. The U.S. Treasury said legitimate expenditures included spending to respond directly to the pandemic, such as medical or public health needs, as well as costs to respond to "second-order" effects, such as economic support to those suffering from employment or business interruptions.

75. At their core, the rules initially issued and later refined by the Treasury classified most unbudgeted expenses directly related to the pandemic as legitimate. They excluded efforts to fill shortfalls in government revenue, construction projects and expenses that would be reimbursed under any federal program. A Treasury guide noted:

> The Fund is designed to provide ready funding to address unforeseen financial needs and risks created by the COVID-19 public health emergency . . . Payroll and benefit costs associated with public employees who could have been furloughed or otherwise laid off but who were

> instead repurposed to perform previously unbudgeted functions substantially dedicated to mitigating or responding to the COVID-19 public health emergency are also covered.

76. Brevard County, one of the 12 largest in Florida, received $105 million for county commissioners to direct as they deemed appropriate. On November 5, 2020, a Parrish senior vice president lobbied the five-member commission for $5 million, which would be used, in part, to expand and remodel the emergency room. Its initial request included an upgrade to the gym and patient rooms.

77. Edwin Loftin, the senior vice president of integrated and acute care services and the chief nursing officer, told the commission that Parrish would make substantial improvements in the emergency department, in the universal respiratory care area and in infection prevention innovations.

78. In exchange for the CARES Act money from the County, Loftin said Parrish was "committed to providing 20 percent back to the community." The hospital identified Blanton Park—an impoverished area with a soup kitchen and a county park—as an area that needed community resources.

79. The proposal brought harsh words from Commissioner John Tobia, who questioned how a hospital could ask for $5 million in emergency money, but "magically" have $1 million it could set aside to help a park. Tobia added that the proposal was ridiculous.

80. Initially, the county commission voted to kill the Parrish proposal. Later, supporters circumvented the Parrish "no" vote by allocating $5 million for each commissioner to spend on any project the commissioner deemed appropriate, provided the project was deemed "low-risk." The CARES Act requires the U.S. Treasury to audit expenditures. Brevard County is required to refund any money that does not follow federal spending rules.

81. The $25 million slush fund created for the five individual commissioners accounted for almost one quarter of the county's entire allocation. Commissioner Rita Pritchett directed her $5 million allocation to Parrish.

82. At the time, Parrish had a net financial position of $93.6 million. Its non-operating revenues increased primarily as a result of $7.5 million it had received under the CARES Act program. Additionally, its profit margins increased, primarily from COVID relief programs and increases in investment income. As a direct result of Cares Act money, 2020 was the first year since at least 2014 in which Parrish had not posted a loss. From 2014 through 2019, Parrish showed losses of more than $53 million. In 2020, as a result of false claims made for Cares Act money, Parrish posted an increase in its net cash position of $2,273,000 as opposed to the prior year when it posted a loss or decrease in its net cash position of $8,189,000. Astonishingly Parrish was able to show a profit in 2020, despite 600 fewer or more than a 12% decrease in admissions and nearly 20% fewer outpatient visits.

83. The special taxing district, the North Brevard County Hospital District, received $10.1 million under the federal Department of Health and Human Services ("HHS") provider relief program. The North Brevard Medical Support, Inc., an affiliate that supplies medical goods and services, received $294,326 in HHS provider relief funds and $1.4 million in federal Payback Protection Loans.

84. Together, CARES Act money directed to Parrish totaled $11.8 million, not counting the $5 million funneled to the North Brevard hospital system by the county commission. The agreement with the commission says:

> (a) Are necessary expenditures incurred due to the public health emergency with respect to COVID-19; and

(b) Were not accounted for in the Hospital's Budget most recently approved as of March 27, 2020; and

(c) Were or will be incurred during the period that began on March 1, 2020, and ends on December 30, 2020. The expense is incurred when the County has expended the funds to cover the expense or reimbursed the Hospital for the expense.

85. Initially, a quarter of the COVID-related expenses amount to an emergency room expansion and remodeling, moving and rebuilding the members-only Health and Fitness Center, replacing doors so they open automatically and adding an electronic patient-tracking system that better allows the hospital to document and coordinate patient care.

86. The U.S. Treasury limited capital expenditures and the expenses of acquiring or improving property to increases in COVID-19 treatment capacity:

> If capital improvement projects are not necessary expenditures due to the COVID-19 public health emergency, then Fund payments may not be used for such projects. . . . Fund payments may be used for the expenses of, for example, establishing temporary public medical facilities and other measures to increase COVID-19 treatment capacity or improve mitigation measures, including related construction costs.

87. Four months after it applied for CARES Act money from the county, the hospital system announced plans to convert the existing Parrish Health & Fitness Center into an orthopedic and sports performance center of excellence. The plan required moving the 5,500-foot fitness center to a new location that, Parrish said, would open in the fall of 2021.

88. Parrish initially sought $200,000 from the county CARES Act money to move "the location of the community Health & Fitness Center to appropriately adhere to safe workouts in accordance with socially distancing guidelines. Build-out new gym space." It characterized the project as "reorganization – Social Distancing Gym."

89. County payment records do not show CARES Act expenditures for the gym.

However, they include $142,000 due the facility's management company. Documentation supplied by Parrish to the County show separate invoices of $87,000 and $85,000 for estimated payroll and management fees. The U.S. Treasury guidance said CARES Act money can only be used to cover costs that were not accounted for in the most recently approved budget. It explained:

> A cost meets this requirement if either (a) the cost cannot lawfully be funded using a line item allotment, or allocation, within the budget *or* (b) the cost is for a substantially different use from any expected use of funds in such a line item, allotment or allocation.

90. It paid $65,500 to replace five hospital doors with touchless automatic doors. Additionally, it allocated $948,777 in construction costs for its emergency room expansion and remodeling project. As justification for use of CARES Act money, Parrish said:

> Construction will convert temporary COVID-19 measures into long-term, safe environments to meet the changing demands for patient care at Parrish Medical Center.

91. Parrish first asked for Brevard County to provide up-front funding for the construction work. The county refused. Shannon Wilson, the deputy county attorney, wrote in a a February 22, 2021 email to Parrish Vice President Loftin:

> Can you give the County a "ballpark" estimate for construction?
>
> Do you have any signed contracts at this point? This would be a good time to begin thinking about the documentation the County will need in order to reimburse Parrish.

92. Wilson explained to Thomasina Middleton of Parrish's financial planning division that:

> . . . the County really hasn't funded any other projects like this with CARES dollars. We had some discussion about submitting expenses on an on-going basis, to come up with a method that would help avoid duplication of submissions, etc.—the County would not pay on a

> piecemeal basis, it would still be a lump sum at the completion of the project.

93. She added in an email to the county budget director:

> At some point, we need to sit down and have a discussion about how to manage the submission of expenses, billings, etc., for this Parrish project.

94. In May 2021, Brevard County began making payments on the "emergency department and patient room remodel" project. First, it paid $55.849 to reimburse Parrish for starting the project. In June, it paid $121,604.63 for continued work. This fall, it paid another $459,996.53 in late September to cover expenses incurred in June, August and September. The payments totaled $637,450.

**VIOLATIONS OF STARK**

95. Defendants entered into improper compensation arrangements and other arrangements that (1) exceeded fair market value; (2) were not commercially reasonable; or (3) took into account the value or volume of referrals or other business generated, in violation of Stark.

96. Both laws contain exceptions and safe harbors for certain types of financial relationships. Generally, these exceptions require that compensation is consistent with fair market value, is determined without considering—directly or indirectly—the volume or value of referrals and that the arrangements are commercially reasonable.

97. Parrish ignored the requirements set out by Stark. It paid numerous doctors compensation far in excess of prevailing standards. Executives knew the salaries were excessive, and that it would lose money on certain physician practices because of those salaries. The District justified the exorbitant salaries by tracking downstream revenue in the form of physician referrals and each doctor's contribution margin to the bottom line.

98. The North Brevard County Hospital District operates a 210-bed, non-profit hospital located in Titusville, Florida. The District has several subsidiaries, including a medical group that employs primary care and specialty physicians. For at least the last seven years, the District, which has not raised taxes in more than 25 years, has experienced financial difficulties with annual losses of more than $8 million.

99. By 2018, senior executives intensified efforts to direct referrals to the hospital, its specialists and its affiliates to stop what they deemed "outmigration"—the practice of referring outside the Parrish network. Parrish estimated the loss of these lucrative referrals cost the health system $4 million per year.

100. Gregg Sargent, the director of operations at Parrish Medical Group, notified staff

that outmigration of patient cases had to change. In an April 5, 2019 email, Sargent wrote:

> "I have been given a directive to help reduce the outmigration of patient cases. In the last 12 months there has been over 4 million in total value of referrals outside of our network. This has got to change if we are going to improve the financial health of our group. Referrals outside of the network should only occur if insurance dictates."

101. Sargent's email listed the Parrish in-network providers for five key practices:

cardiology, orthopedics, gastroenterology, ophthalmology and urology. The reports break down the referrals inside and outside the network by doctor. After capital contributions, the District lost more than $53 million from 2014 through 2019, reducing its net position.

102. One physician quit rather than submit to the directives. A month later, in May

2019, Ben Nettleton, D.O. wrote to Parrish President Mikitarian to negotiate a "fair" contract amid questions over the doctor's referral practices:

> "I recognize Parrish is trying to stay afloat financially, but I believe I do not wish to become the physician Parrish and Omni are trying to force me to become. If I stay in your system there will continue to be distracting strife and dissonance.
>
> If you want or need someone who will bend referrals to your will, I may not be that physician as well. I have an obligation to do what is best for my patients, and I am still learning the specialists, but please note that I do not maliciously re-route patients out of your network unless requested by the patient or if I believe it is in the best interest of the patient to do so."

103. In the May 10, 2019 email, Nettleton defended his medical judgement with a point-by-point defense of his decisions to refer outside the Parrish network. Many of his patients, he wrote, live too far away to travel to the Parrish Medical Center for treatment. He added:

> "Cardiology- Dr. Rao. [A physician outside the Parrish network] This is the big one. I stopped going out of my way to send patients to him in July 2018, even though I feel he is a good cardiologist, because so is Dr. Matthews and I have no reason to not utilize him.
> However, many patients are established with Dr. Rao already, and others request him, and I cannot conscientiously re-route those when I do not believe it is in the best interest of the patient to do so."

104. Neither the requested meeting with Mikitarian, nor the "fair contract" occurred. An hour after Nettleton's email, Mikitarian informed the principal at Relator Omni that he would not meet with the doctor. The company president sent Nettleton an email accepting Nettleton's resignation. Mikitarian circulated another response to Relator Omni's principal:

> "The guy is a lunatic."

105. Its physician contracts emphasized the District's referral policies. A draft agreement for E. Wayne Mosley, M.D., an orthopedic surgeon, said:

> "Physician shall exclusively utilize Hospital, its subsidiaries and affiliates, including but not limited to Parrish Health Network for the provision of the services referenced herein, as well as all related ancillary and other services that Physician may order in connection therewith, except in any of the following circumstances:
>
> - The patient expresses a preference for a different provider or supplier; after physician has indicated their exclusive use of Hospital services
> - The patient's insurance determines the provider or supplier
> - In physician's judgment, doing so would not be in the patient's best medical interests."

106. The agreement explains that the contract provision "shall not be construed" to require the physician to refer patients to Parrish Medical Center, its subsidiaries or affiliates. However, doctors were acutely aware that they were to refer patients to the District.

107. Parrish regularly tracked referrals, the revenue generation of its employed physicians and their "contribution margin"—the sum of net payments minus direct costs. It then loaded the contribution margin by specialty into a referral management tool to calculate the value of "leakage."

108. Aggregated reports showed the "Leakage Trends" by practice and by month, the reason for the referral, the top out-of-network providers and the Parrish alternatives. From April 2018 through March 2019, a consultant to the District estimated the out migration totaled $4.7 million. Out-of-network providers received between 26 percent and 29 percent of all of the District's patient referrals.

109. Cardiovascular services, for example, referred 398 patients outside the Parrish network. Cardiologists did not provide a reason for the referral for 274 of the patients. The hospital district estimated the referral value at $1.2 million. A second practice, Orthopedics, placed 241 patients with out-of-network providers at an estimated value of $851,041.

110. Detailed reports broke out the number of referrals by doctor and listed the percentage directed toward other providers. Income reports tracked revenue and direct expenses by physician and the practice. The income report for the neuro//ortho practice headed by Dr. Mosley shows a substantial loss, a loss nearly equal to his salary. His productivity was in the 10th percentile. A management company, brought in by Parrish to help improve its financial position, questioned how the arrangement with Mosley was sustainable. These income reports did not include the downstream revenue accrued by the 210-bed Parrish Medical Center.

111. The income report shows a net operating loss of $591,472 for Mosley and a loss of $1.1 million for the practice. The report lists the contractual obligation to Mosley at $522,168. His draft contract showed a base salary of $600,000.

112. Parrish budgets for practice after practice to lose money. Overall, it planned for the practices to lose $1.4 million through February 2019. They lost $1.6 million, in large measure from excessive compensation paid to physicians.

113. Stark and related regulations provide exceptions for certain compensation

arrangements, including bona fide employment relationships, personal services arrangements, fair market value arrangements and indirect compensation relationships. To qualify for these exceptions, these arrangements must meet these statutory requirements:

- Remuneration must be at fair market value and not based on the value or volume of referrals; and
- Remuneration would be commercially reasonable even in the absence of referrals from the physician to the hospital.

42 .S.C. §§ 1395nn(e)(2)(B) and (e)(2)(C).

114. Defendants knowingly made decisions to pay compensation in excess of fair market value, taking into account the value or volume of services generated to the hospital from referrals. They selectively ignored losses and other factors that rendered these contracts not commercially reasonable to maintain revenue generated from patient referrals.

115. From **XXX to YYY,** Omni managed the Parrish Medical Group. Its duties included evaluating the medical needs of the community, communicating with employees and doctors and recruiting physicians. At the medical group's internal meetings, employees and physicians frequently complained about the service provided by cardiologists in North Brevard.

116. Despite the staff's complaints and a documented need for additional services, Parrish revoked or refused to renew the medical privileges of at least four cardiologists over the last decade. The medical group requested the system hire additional heart specialists. Omni was not permitted to recruit or hire them.

117. Relator Omni understood the decision not to recruit or hire cardiologists rested

upon an "arrangement" between the hospital system and the existing cardiology practices in North Brevard.

118. Some practices were paid to refer their patients to the medical center. Parrish purchased the nuclear medicine equipment of one cardiology group, which then assigned their employees to Parrish and referred all of their nuclear studies and their patients to the health care system and its medical group. At about the same time, Dr. Biju Mathews, a member of the cardiovascular group, received a medical directorship engineered by Parrish.

**DAMAGES**

119. Relators estimate the damages caused by Defendants' collective actions are in excess of $10 million.

**RETALIATION**

120. In March 2021, Relators Omni and John Doe raised concerns to the President, Chief Financial Officer and Chief Compliance Officer of Parrish, alerting them to the fact that the hospital district was violating the FCA. After raising those initial concerns, Relators uncovered evidence, described above, that Parrish has received improper payments through the LIP and CARES Act programs.

121. Omni and John Doe, an agent of Omni, attempted to provide evidence documenting the fraud to Parrish's Chief Compliance Officer, the Chief Financial Officer and President. The senior executives ignored Relators' concerns.

122. Rather than investigate Parrish, at the direction of the senior executives, retaliated. It blocked email addresses, terminated contracts and leases, and filed lawsuits against Relator Omni. Defendant Mikitarian sued Relator Omni and its principal, Craig Deligdish, for defamation.

123. The defamation lawsuit alleged Relator Omni, Deligdish and a third defendant, Frank Harrison, wrongfully accused Mikitarian and Parrish of fraud, conspiracy and violations of the False Claims Act. The lawsuit alleged that "Harrison," the third defendant, is a fraudulent alias used or controlled by Deligdish. The lawsuit was dismissed with prejudice after a hearing on January 13, 2022.

124. Correspondence to the media, members of Parrish's Board of Directors and other community leaders describes the arrangements between Parrish and Halifax, which involved manipulation of LIP funds. A letter to Robert Jordan, the Chairman of the hospital's Board of Directors, said:

> These financial transactions, in which millions of dollars have been exchanged between these institutions suggest that these institutions have misrepresented information to AHCA for their own benefit and to the detriment of other institutions that participate in the Low Income Pool.
> On the surface it appears that both institutions conspired to launder government money. Your board approved these transactions knowing full well they were illegal.

125. When senior officials at Parrish refused to take action, Deligdish brought the matter to the attention of the Office of Inspector General at AHCA. The OIG granted Deligdish whistleblower status under Fla. Stat. §112.3187.

126. The OIG is currently investigating AHCA's role in the transaction between the two hospitals. In a September 17, 2021 letter to Deligdish, Inspector General Mary Beth Sheffield wrote:

> . . . the allegations related to actions by the hospitals to launder money does not fall under the AHCA OIG purview; therefore, it is recommended you contact the U.S. Department of Justice for those concerns.

127. Retaliation by Parrish against Relators Omni and Doe—which occurred after Relators' efforts to disclose substantial fraud by the hospital district against government programs—resulted in termination of contracts worth millions of dollars, and substantial legal expenses incurred by Omni, which were used to fight the arbitrary and capricious actions taken against it and Doe.

**COUNT 1**

**Violations of the Federal False Claims Act and the Stark Act**

128. Relators incorporate paragraphs 1-127 of this Complaint as though fully set forth herein. This Count sets forth claims for treble damages and civil penalties under the FCA.

129. As described in greater detail above, Defendants defrauded the Government by abusing and manipulating the LIP Program and the CARES Act for their financial gain, and at the expense of taxpayers and those citizens for whom the funding was intended to help. Additionally, Defendants engaged in the submission of claims which Defendants knew were tainted by violations of the Stark statute.

130. Under the FCA, Defendants have violated:

i. 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval;

ii. 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim;

iii. 31 U.S.C. § 3729(a)(1)(C) by conspiring to commit a violation of 31 U.S.C. by conspiring to commit a violation of 31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B); and

iv. 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

131. Because of Defendants' submission of false and/or fraudulent claims, the United State has suffered damages, and is therefore entitled to a recovery of an amount to be determined at trial, plus a civil penalty of $10,781 to $21,563 for each such claim.

**COUNT II**

**Violations of the Florida False Claims Act and the Stark Act**

132. Relator incorporates paragraphs 1 through 127 of this Complaint as though fully set forth herein. This count sets forth claims for treble damages and forfeitures under the Florida False Claims Act, Fla. Stat. § 68.081, *et seq.*

133. As described in greater detail above, Defendants defrauded Government health care programs, including the Florida Medicaid program, by conspiring to submit and/or causing the submission of false and/or fraudulent claims in conjunction with abuse of the LIP program and the CARES Act, as well as the submission of claims which Defendants knew were tainted by violations of the Stark statute.

134. Under the Florida FCA, Defendants have violated:

i. Fla. Stat. § 68.082(2)(a) by knowingly making, using, or causing to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency;

ii. Fla Stat. § 68.082(2)(b) by knowingly making, using, or causing to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency; and

iii. Fla. Stat. § 68.082(2)(c) by conspiring to commit a violation of subsections (a) and/or (b).

135. Because of the false claims made by Defendants, the State of Florida has suffered and continues to suffer damages, and is therefore entitled to a recovery as provided by the Florida FCA of an amount to be determined at trial, plus a civil penalty for each violation.

**COUNT III**

**Retaliation Under the Federal False Claims Act**

136. Relators incorporate paragraphs 120-127 of this Complaint as though fully set forth herein. This Count sets forth claims for treble damages and civil penalties under the FCA.

137. Under the FCA, 31 U.S.C. § 3730(h), an "employee, agent, or contractor" who, because of their efforts to stop a violation of the FCA, is "threatened, harassed, or in any other manner discriminated against," is entitled to relief.

138. As alleged in detail above, Relators engaged in lawful acts in furtherance of their efforts to stop Defendants' fraudulent actions regarding the LIP program. Therefore, they are entitled to compensation to make them whole, as well as special damages, to include litigation costs and reasonable attorney's fees.

**PRAYER**

WHEREFORE, Relator, on behalf of the United States and the State of Florida, respectfully requests that:

a. This Court enter an order determining that Defendants conspired to violate the FCA and the Florida FCA by making false statements and records to cause false claims to be submitted to the United States and the State of Florida;

b. This Court enter an order requiring Defendants to pay treble damages and the maximum civil penalties allowable to be imposed for each false or fraudulent claim presented to the United States and each false or fraudulent claim presented to the State of Florida;

c. This Court enter judgment against Defendants pursuant to 31 U.S.C. § 3730(h), including an award to Relator of two times the amount of damages sustained as a result of Defendants' actions, as well as litigation costs and reasonable attorney's fees;

d. This Court enter an order requiring Defendants to pay all expenses and attorney's fees and costs associated with this action;

e. This Court enter an order paying Relators the maximum statutory award for their contributions to the prosecution of this action; and

f. Any and all other relief this Court deems to be reasonable and just.

**PLAINTIFFS/RELATORS DEMAND A TRIAL BY JURY ON ALL COUNTS.**

Dated: January _____, 2022

Respectfully submitted,

*/s/ Jesse Hoyer Estes*
Jesse Hoyer Estes
Florida Bar No.: 076934
jesse@hoyerlawgroup.com
Hoyer Law Group, PLLC
2801 W. Busch Blvd., Suite 200
Tampa, Florida 33618
Tel.: 813-375-3700

Fax: 813-375-3710