**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

UNITED STATES OF AMERICA and STATE OF FLORIDA, *ex rel.* CRAIG DELIGDISH, M.D.,

Plaintiffs,

v.

NORTH BREVARD COUNTY HOSPITAL DISTRICT d/b/a PARRISH MEDICAL CENTER; HALIFAX HOSPITAL MEDICAL CENTER TAXING DISTRICT d/b/a HALIFAX HEALTH; GEORGE MIKITARIAN; CHRISTOPHER MCALPINE; ANNUAL JACKSON, SR.,

Defendants.

Case No. 6:22-cv-00696-PGB-DCI

**DEMAND FOR A JURY TRIAL**

---

**SECOND AMENDED *QUI TAM* COMPLAINT**

---

Plaintiff-Relator Craig Deligdish, M.D. ("Relator" and/or "Dr. Deligdish"), by himself and on behalf of the United States of America (the "United States" and/or "Government") and the State of Florida, alleges and claims against defendants Halifax Hospital Medical Center Taxing District d/b/a Halifax Health ("Halifax"), North Brevard County Hospital District d/b/a Parrish Medical Center ("Parrish"), George Mikitarian, Christopher McAlpine, and Anual Jackson, Sr.'s (collectively, the "Parrish Defendants") (collectively "Defendants") as follows:

## INTRODUCTION

1. This is an action to recover damages and civil penalties on behalf of the United States and the State of Florida arising from false and/or fraudulent statements, records, and claims made by Defendants.

2. The Parrish Defendants violated the FCA in connection with the Coronavirus Aid, Relief, and Economic Security Act (Pub. L. 116- 136) ("CARES Act"). The CARES Act, a $2.2 trillion economic stimulus bill signed into law in 2020, aims to provide relief for individuals and businesses affected by the COVID-19 pandemic. The CARES Act does not permit physician groups to receive government funding for services already covered by other COVID relief programs, non-COVID capital expenditures, or previously budgeted expenditures.

3. Parrish also compensated doctors for the value and volume of their referrals, in violation of the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA"), the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.* ("FFCA"), and the Physician Self-Referral Law, 42 U.S.C. § 1395nsarln ("Stark Law"). Parrish violated the Federal Stark Law, which makes it illegal for hospitals to compensate referring physicians based on the value and volume of referrals for designated health services, by paying physicians commercially unreasonable compensation in exchange for referrals. The physicians' compensation was not based on fair market value.

4. Defendants violated the FCA and FFCA in connection with certain interlocal agreements between the entities involving Florida's Low Income Pool Program ("LIP"). LIP, first established in 2005, reimburses hospitals and providers for

the cost of care given to Florida's most vulnerable patients. LIP was placed under federal oversight under the Centers for Medicare and Medicaid Services' ("CMS") and provides direct payments to safety-net providers whose purpose is to provide health care services to Medicaid, underinsured, and uninsured patients.

5. As discussed herein, Defendants colluded to defraud LIP, knowing the interlocal agreements were improper and, in doing so, submitted false and/or fraudulent claims for payment to the United States and the State of Florida, and/or improperly avoided an obligation to return funds to the Government.

6. The FCA and FFCA provide that a person may bring a federal or state civil action on behalf of the Government for civil penalties and damages arising from false claims submitted to the Government. Under the FCA, one who knowingly submits or causes to be submitted to the Government a false or fraudulent claim for payment or approval is liable for a civil penalty of $13,946 to $27,894 for each such claim plus three times the amount of the damages sustained by the Government, as provided by 31 U.S.C. § 3729(a), 28 CFR Part 85 (see also 89 FR 9764, Feb. 12, 2024). Under the FFCA, one who knowingly submits or causes to be submitted to the Government a false or fraudulent claim for payment or approval is liable for a civil penalty of $5,500 to $11,000 and treble the damages sustained as a result.

7. Pursuant to the FCA and the FFCA, and on behalf of the United States and the State of Florida, Relator seeks to recover damages and civil penalties arising from Defendants' submission of false and/or fraudulent claims to the Government.

## PARTIES

8. The United States and the State of Florida are real parties of interest in this action.

9. Relator Craig Deligdish, M.D. is the President and a shareholder of OMNI Healthcare, Inc. ("OMNI"), a multi-specialty physician group based in Brevard County, Florida. OMNI operates in the fields of internal medicine, surgery, pediatrics, family practice, and other medical and sub-specialties. Relator is an oncologist who is duly licensed and qualified to practice medicine in the State of Florida. Relator has conducted business in Brevard County, Florida since 1988 and had medical staff privileges and served as a Medical Director at Parrish since 2017. The facts alleged within are based on the personal observation of Relator, as well as documents and information in his possession. The information and observations led Relator to question Defendants' fraudulent actions.

10. Defendant Parrish is an independent special taxing district located in Brevard County, Florida with operations in Port St. John and Port Canaveral. Parrish operates a 210-bed not-for-profit community hospital in Titusville, Florida. Parrish also operates an affiliated medical group, Parrish Medical Group ("PMG"), as well as related support services, including clinics, home health services, a cancer center, a health and fitness center, and various outpatient healthcare facilities.

11. Defendant George Mikitarian has been the President and Chief Executive Officer of Parrish since January 2001. Mikitarian supervises, directs, and approves operations for Parrish.

12. Defendant Christopher McAlpine is the Chief Transformation Officer and a Senior Vice President at Parrish. McAlpine is responsible for strategic planning, business development, and strategy at Parrish.

13. Defendant Anual Jackson, Sr. has been the Chief Corporate Compliance and Privacy Officer at Parrish since 2012. Jackson is responsible for ensuring that Parrish operates in a legal and ethical manner.

14. Defendant Halifax is a legislatively-chartered taxing healthcare organization governed by a Board of Commissioners who are appointed by the Governor of Florida. Halifax is in an independent special district, a unit of government created for a particular purpose with jurisdiction within a limited geographic boundary. In Florida, these districts have only those powers expressly provided by, or reasonably implied from, the authority in their charters. They provide specific municipal services in addition to, or in place of, those provided by a municipality or a county in a specific geographic area.

**<u>JURISDICTION AND VENUE</u>**

15. As this action arises under the FCA, 31 U.S.C. § 3729, *et seq.*, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 § U.S.C. 3732.

16. This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in the Middle District of Florida.

17. Venue lies in the Middle District of Florida pursuant to 31 U.S.C. §

3732(a), because all Defendants can be found to reside in and/or have transacted business in this judicial district.

18. Relator knows of no other FCA complaints filed against Defendants alleging the same or similar actions for the time period at issue. In any event, this Court has jurisdiction under 31 U.S.C. § 3730(e)(4) because Relator is an "original source" since he has voluntarily provided this information to the Government before filing this Complaint, and has knowledge, which is both direct and independent of, and materially adds to, any public disclosure to the extent they may exist.

19. Specifically, in late June 2021, Relator engaged in a series of phone calls and emails with members of the Government, including investigators from HHS-OIG regarding the fraudulent LIP fund transfers. In one such exchange, on June 17, 2021, Relator not only described the transaction to HHS-OIG, but provided the underlying materials that he relied on to support the allegations in this Second Amended Complaint.

20. On June 27, 2021, Relator made additional voluntary disclosures to the Government, including potential CARES Act violations committed by Parrish. Relator had firsthand knowledge of the facts upon which the disclosures were made.

21. During this same period, and prior to his termination from Parrish, Relator disclosed the allegations to Parrish Defendants directly, in both direct email exchanges as well as phone calls.

## APPLICABLE LAW

### A. The False Claims Act and Florida False Claims Act

22. The FCA, 31 U.S.C. §§ 3729 *et seq*. reflects Congress' objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345 at 1 (1986). The FCA provides, *inter alia*, that any person or entity that commits any of the following violations is liable to the United States for a civil monetary penalty of at least $13,946 and not more than $27,894 plus three times the amount of damages sustained by the Government for each violation for the following acts:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
> (B) knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim;
> (C) conspires to commit a violation of the False Claims Act under 31 U.S.C. §3729(a)(1) and (a)(1)(B);
> (D) knowingly makes, uses, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government; or knowingly conceals or knowingly and improperly avoids or decreased an obligation to pay or transmit money or property to the Government.
> …
> (G) knowingly makes, uses, or causes to be made or used, a false record or
> statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

31 U.S.C. §3729(a)(1).

23. Under the FCA, the terms "knowing" and "knowingly" mean that a person with respect to information (i) has actual knowledge of the information; (ii) acts

in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information. An innocent mistake is not a defense, as specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1); (1)(B).

24. The FCA defines the term "claim" as (A) any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. 31 U.S.C. § 3729(b)(2).

25. The FCA defines the term "obligation" as an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment. 31 U.S.C. § 3729(b)(3).

26. An overpayment retained by a person after the later of 60 days after the date on which the overpayment is identified or the date any corresponding cost report is due, if applicable, is an "obligation" as defined by the FCA. 42 U.S.C. § 1320a-7k(d).

27. The Florida False Claims Act, Fla. Stat. § 68.081, *et seq.* is modeled after

the Federal FCA and contains similar provisions to those described herein, allowing a civil monetary penalty of $5,500 and not more than $11,000 plus three times the e amount of damages sustained by the Government for each violation.

**B. The Stark Law**

28. The Stark Law, 42 U.S.C. § 1395nn, provides that if a physician or member of his immediate family has a "financial relationship" with an entity providing healthcare services:

> (a) the physician may not make a referral to the entity for the furnishing of designated health services...and
> (b) the entity may not present or cause to be presented a claim under this subchapter or bill any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn(a)(l).

29. The regulations implementing the Stark Law state that a "financial relationship" may include "a direct or indirect compensation arrangement ... with an entity that furnishes [designated health services]." 42 C.F.R. § 411.354(a)(l)(ii). A "compensation arrangement" can be "any arrangement involving remuneration, direct or indirect, between a physician ... and an entity." *Id.* at§ 411.354(c).

30. Compliance with the Stark Law is a precondition for payment from Medicare.

31. An express or implied certification accompanies each claim submitted to Medicare for reimbursement of health services provided to beneficiaries that the transaction is not in violation of federal or state statutes, regulations, or program rules.

Falsely certifying compliance with the Stark Law in connection with a claim submitted to a federally-funded health care program is actionable under the FCA.

32. The Stark Law is a strict liability statute and, therefore, intent is not required to form a violation of the law.

**C. The Low Income Pool Program**

33. On October 19, 2005, CMS approved the 1115 Research and Demonstration Waiver Application for the State of Florida, relating to Medicaid reform. The Florida Legislature passed House Bill 3B on December 8, 2005, authorizing implementation of the waiver effective July 1, 2006. In the Waiver's Special Terms and Conditions ("STC"), the LIP is "established to ensure continued government support for the provision of health care services to Medicaid, underinsured and uninsured populations. The low-income pool consists of a capped annual allotment of $1 billion total computable for each year of the 5-year demonstration period." The parameters of LIP are defined in STCs 91- 106.

34. The LIP Program was created in conjunction with Florida's implementation of the Medicaid managed care program. These supplemental payments flow to county health departments, Federally Qualified Health Centers ("FQHCs") and other safety-net providers from a federal program. Contributions from local and state governments match the federal money. Together, the federal, local and state aid to Florida's safety-net healthcare providers initially totaled $1 billion per year.

35. STC Number 94 states that "LIP funds may be used for health care

expenditures (medical care costs or premiums) that would be within the definition of medical assistance in Section 1905(a) of the Act. These health care expenditures may be incurred by the State, by hospitals, clinics, or by other provider access systems ("PAS") and insurance products for such services provided to otherwise uninsured individuals, as agreed upon by the State and CMS."

36. In accordance with STCs Numbers 93 and 100, the State submitted to CMS on June 26, 2006, the first Reimbursement and Funding Methodology document ("RFMD") for LIP expenditures, which includes the definition of expenditures eligible for Federal Matching funds under the LIP and entities eligible to receive reimbursement. The STCs together with the Reimbursement and Funding Methodology document govern the LIP program.

37. Through the LIP Program, the State of Florida and the Government jointly reimbursed hospitals for care provided to uninsured and underinsured patients. The LIP Program is overseen by the Florida Agency for Health Care Administration ("AHCA"), which operates Florida's Medicaid program.

38. Each year, hospitals, health departments and FQHCs pledge hundreds of millions of dollars to the AHCA, which then uses the contributions to draw federal funding. The AHCA informs the providers they will not receive less than the amount they contributed. For example, in 2016-2017, a contribution of $0.39 returned $1.

39. The AHCA requires local government contributors to complete an LIP agreement that spells out their financial commitment, the program rules, the proper use of the aid, audit procedures, and record keeping.

40. The AHCA bills contributors who must transmit the money by Intergovernmental Transfer ("IGT"). A summary of the program explains:

> Since many health care facilities benefit from IGT funds used for federal match, IGT providers are encouraged to contribute funds in order to ensure maximum payments from the LIP program. Health care providers are encouraged to contact potential IGT providers in their area to secure IGT funding.

41. Florida agreed it would not receive any federal money in excess of allowable costs and that CMS may recoup any overpayments. To comply, AHCA required recipients to calculate an LIP Cost Limit, submit reports detailing the uncompensated care provided, and undergo an audit to reconcile the payments.

42. The process provides that the AHCA is supposed to reconcile the LIP payments made to recipients with money provided to these hospitals through other federal and state aid programs that care for the state's poorest and most vulnerable patients, such as Medicaid and the Disproportionate Share Hospital Payments ("DSH"). If the provider's LIP payments for the fiscal period exceeded its LIP Cost Limit, the provider was required to return the excess payment to Florida. Florida is then required to refund the federal share of that payment to CMS.

***i. The AHCA's Historic LIP Program Mismanagement***

43. The AHCA has been repeatedly criticized for failing to provide adequate oversight and guidance for the LIP program. CMS conducted two Financial Management Reviews of the LIP Program covering [state fiscal years] 2007 through 2009 and found that AHCA did not provide hospitals with adequate oversight and guidance. As a result, the hospitals claimed unallowable costs and inconsistently

documented, calculated, and reported costs.

44. From state fiscal year 2007 through 2014, CMS disallowed $146.1 million of federal funds related to LIP Program overpayments that AHCA did not refund. In an April 14, 2015 letter to Florida, CMS wrote:

> ... over time, CMS has had a number of concerns about the LIP [Low Income Pool], including its lack of transparency, encouragement toward overreliance on supplemental payments and distribution of funds based on providers' access to local revenue instead of service to Medicaid patients.

45. As a result of the financial risk uncovered by CMS, the Federal Department of Health and Human Services ("HHS") Office of the Inspector General ("OIG") audited the LIP Program's costs and expenditures for the state's largest recipient, Jackson Memorial Hospital in Miami, Florida. In August 2019, CMS recommended that Florida return $412 million.

46. Two years earlier, in January 2017, CMS demanded Florida return $97 million in LIP Program overpayments because its hospitals did not properly offset money received from other federal healthcare programs. Florida challenged the decision and in February 2021, the Department of HHS Appeals Board upheld the CMS decision to disallow the money, finding that the cost reconciliation procedures to which Florida and CMS have agreed under the waiver (LIP Program) required offsetting of all payments that amounted to revenue to the hospitals related to otherwise-uncompensated care costs. *See Florida Agency for Health Care Administration,* DAB No. 3031 (2021).

47. The AHCA's reconciliation of LIP Program payments, the review

designed to ensure costs are justified, is deficient. For example, the 2017 fiscal year examination, demonstration year 11, has yet to be completed.

**D. The CARES Act**

48. The CARES Act was enacted on March 27, 2020 in response to the COVID-19 pandemic to provide fast and direct economic assistance for American workers, families, small businesses and industries. *See* Pub. L. No. 116-136, 134 Stat. 281 (2020). The law allocated $150 billion to states and localities through the Coronavirus Relief Fund (the “Fund”) battling the pandemic and $130 billion more for the healthcare system. Other aid packages directed billions of dollars to loans for small businesses, hospitals, and health care providers.

49. The CARES Act provides that payments from the Fund may only cover costs associated with certain categories, including "necessary expenditures" incurred due to the public health emergency. The U.S. Treasury said legitimate expenditures included spending to respond directly to the pandemic, such as medical or public health needs, as well as costs to respond to "second-order" effects, such as economic support to those suffering from employment or business interruptions.

50. Eligible local government recipients could allocate monies received from the Fund at their discretion to minimize the impact of the pandemic on their communities. Funds recipients then awarded grants to subrecipients, such as local governments, provided these subrecipients complied with the CARES Act and the Fund’s regulations. According to the Terms and Conditions set forth by the Department of Health and Human Services ("HHS"), in order for a business to

participate in the CARES Act program, "the Recipient certifies that it will not use the Payment to reimburse expenses or losses that have been reimbursed from other sources or that other sources are obligated to reimburse."

51. At their core, the rules initially issued and later refined by the Treasury classified most unbudgeted expenses directly related to the pandemic as legitimate. They excluded efforts to fill shortfalls in government revenue, construction projects, and expenses that would be reimbursed under any federal program. According to the U.S. Treasury:

> The Fund is designed to provide ready funding to address unforeseen financial needs and risks created by the COVID-19 public health emergency ... Payroll and benefit costs associated with public employees who could have been furloughed or otherwise laid off but who were instead repurposed to perform previously unbudgeted functions substantially dedicated to mitigating or responding to the COVID-19 public health emergency are also covered.

52. The U.S. Treasury limited capital expenditures and the expenses of acquiring or improving property to increases in COVID-19 treatment capacity:

> If capital improvement projects are not necessary expenditures due to the COVID-19 public health emergency, then Fund payments may not be used for such projects. Fund payments may be used for the expenses of, for example, establishing temporary public medical facilities and other measures to increase COVID-19 treatment capacity or improve mitigation measures, including related construction costs.

## ALLEGATIONS

### A. Parrish and Halifax Collude to Retain LIP Program Funds Belonging to the Government

53. In 2015, the AHCA presented findings concerning the LIP and requested that CMS redesign its funding structure to account for the additional coverage

opportunities afforded to Florida residents, including the Affordable Care Act and Florida's Medicaid program's shift to the Managed Medical Assistance ("MMA") program. As a result, and in conjunction with CMS, the AHCA issued an RFMD on July 10, 2015 to re-structure funding protocol under the LIP for Demonstration Year ("DY") 9, which ended on June 30, 2015.

54. Pursuant to the redesigned payment structure, for each DY, the State "must reconcile LIP payments made to providers to ensure that they do not include unallowed uncompensated care costs, using the CMS approved RFMD cost review protocol." CMS was then tasked with reviewing this reconciliation and sharing its findings with the State. If payments were found to include "any unallowed uncompensated care costs, the federal portion of any excess payment must be returned to CMS."

55. In 2017, to circumvent the AHCA's reconciliation and return requirement for unused funds, the Halifax offered the Parrish Defendants, the adjacent hospital district, an opportunity for a quick profit with little risk under the guise of an interlocal agreement.

56. In a one-page memorandum to its Board of Directors dated October 31, 2017, Parrish summarized the interlocal opportunity as follows:

> The primary purpose of the interlocal agreement is to obtain $200,000 in increased Medicaid funding under the Low Income Pool (LIP) program.
>
> The benefit to Halifax is to relieve it of excess LIP funds it would otherwise owe by designating LIP payments to other public hospitals. The Arrangement will be submitted to the Florida Agency for Health Care Administration (AHCA) to transfer LIP funds in their records.

> Under the interlocal agreement, PMC will receive a wire transfer from Halifax in the amount of $4,434,000. PMC will then transfer $4,234,000 to an account identified by Halifax. PMC will retain the difference of $200,000 for providing care to Medicaid, underinsured and uninsured individuals.

57. On November 13, 2017, an interlocal agreement ("2017 Agreement") between Halifax and Parrish was finalized and filed with the Brevard County Clerk of Court. Interim Chief Financial Officer, Michael Sitowitcz, and President/CEO Mikitarian executed the 2017 Agreement on behalf of Parrish alongside Peburn, Halifax's Chief Financial Officer.

58. The 2017 Agreement describes the three-step process by which the two taxing districts manipulated the LIP so Halifax would not have to repay monies owed to the Government under the DY 9 reconciliation procedures. The 2017 Agreement includes a provision wherein Halifax agrees to indemnify, defend, and hold harmless Parrish.

59. Halifax agreed to transfer $4 million in unused LIP funds to Parrish Defendants in order to avoid returning the funds to the Government, as prescribed by CMS and the AHCA. The agreement allowed Halifax to show a decrease in the DY 9 LIP payments earmarked to Halifax by $4,340,000. Instead of returning the unusable funds to the Government, Halifax contracted to transfer $4,340,000 to Parrish Defendants, effectively removed any LIP overpayment to Halifax.

60. According to the arrangement, Halifax agreed to wire transfer the $4,340,000 to a Parrish account. Parrish Defendants agreed to return $4,140,000 to

Halifax immediately, and then pocketed the remaining $200,000.

61. The agreement with AHCA requires LIP fund recipients to use the supplemental aid to increase the provision of health services for charity care. The Letter of Agreement said:

> The [IGT Provider] and the Agency have agreed that these IGT funds will only be used to increase the provision of health services for charity care of the [IGT Provider] for the State of Florida at large.
>
> The increased provision of charity care health services will be accomplished through ... LIP payments to hospitals, federally qualified health centers, Medical School Physician Practices, and rural health centers pursuant to the approved Centers for Medicare & Medicaid Services Special Terms and Conditions.

62. The special terms and conditions of the LIP explicitly state LIP funds "may be used for health care costs-medical care costs or premiums-that would be within the definition of medical assistance in Section 1905(a) of the ACT."

63. The RFMD provides instructions for calculating the LIP cost limits for hospitals. For DY9, a reconciliation must take place based on the CMS-2552 cost report. The instructions explained:

> If, at the end of the interim reconciliation process, it is determined that a hospital received an overpayment, the overpayment will be properly credited to the Federal government.

64. Parrish Defendants violated federal law when they accepted, but did not use, the entire additional LIP allotment of $4,340,000 to care for Medicaid, underinsured and uninsured patients. Instead, they earmarked $200,000 to provide care for Medicaid, underinsured, and uninsured patients and transferred the remainder, $4,140,000, to Halifax. Neither the agreement nor Parrish's memorandum

describes any restriction on the use of the money sent from Parrish to Halifax. These agreements do not say the money must be used for charitable care.

65. Two years later, on December 10, 2019, a second similar interlocal agreement for LIP fund redistribution ("2019 Agreement") was executed by Parrish's President/CEO Mikitarian and Halifax's Chief Financial Officer, Peburn.

66. In the 2019 Agreement, Halifax re-designated $1.5 million of its IGT's already paid to the AHCA to Parrish Defendants for DY 9. The reallocation decreased Halifax DY 9 payments $1,627,500 and increased Parrish DY 9 payments by the same amount.

67. Parrish Defendants agreed to transfer only $1,527,500 back to Halifax and pocket $100,000 for "administrative costs." The 2019 Agreement does not indicate how Parrish Defendants intended to, or were permitted to, use the $100,000 LIP funding.

68. Again, Parrish Defendants accepted, but did not use the surplus LIP funding for the care of the area's vulnerable patients in violation of federal law and Parrish Defendants' agreement with Florida.

69. Both the 2017 Agreement and 2019 Agreement indicate that the transfer of funds were both designated for DY 9 and there is no explanation as to why these agreements were two years apart for the same DY.

70. Under both agreements with Halifax, Parrish Defendants accepted kickbacks in exchange for circumventing the regulations governing a federal program that provides supplemental funds to care for the uninsured and underinsured. Parrish

Defendants agreed to the deal despite questions raised by Parrish's counsel over whether the arrangement was legal.

71. A June 17, 2021 letter from Relator to Robert Jordan, the Chairman of Parrish's Board of Directors, said:

> These financial transactions, in which millions of dollars have been exchanged between these institutions suggest that these institutions have misrepresented information to AHCA for their own benefit and to the detriment of other institutions that participate in the Low Income Pool.
>
> On the surface it appears that both institutions conspired to launder government money. Your board approved these transactions knowing full well they were illegal.

72. Despite the narrative promulgated by both Parrish Defendants and Halifax concerning their redesignation scheme, framing it as a common procedure concerning unused LIP funds, Halifax has executed only one other similar interlocal agreement for redesignation in the last ten years.

73. Accordingly, Defendants intentionally completed the unusable LIP fund transfers from Halifax to Parrish and back to Halifax with awareness of the improper nature of the agreements and the improper manner by which the agreements were executed. Defendants were also aware of the intended improper use of the surplus funds.

74. Relators estimate the damages caused by Defendants' collective actions to be in excess of $10 million.

*i.* ***Defendants had No Authority to Enter into the Interlocal Agreements***

75. In 2017, Halifax's charter limited its operations to a portion of Volusia

County. Legally, it did not have the authority to operate outside of its district boundaries, including contracting through inter-local agreements with other government units outside its area.

76. Inter-local agreements "permit local government units to make the most efficient use of their powers by enabling them to cooperate with other localities to provide services and facilities in a manner pursuant to forms of governmental organization that will accord best with geographic, economic, population and other factors influencing the needs and development of local communities." Fla. Stat. § 163.01(2). This law authorizes public agencies to enter into contracts for the performance of service functions.

77. The PMC was created as a special taxing district expressly for the purpose of equipping, maintaining and operating a hospital in northern Brevard County. Its enabling legislation permits Parrish to enter into joint ventures with not-for-profit and for-profit health care ventures operating within and beyond its geographic boundaries.

78. However, the law expressly prohibits Parrish from using money derived from *ad valorem* taxes to support any healthcare facility or service operated outside Parrish's boundaries. The law does not allow Parrish to purchase stock in such corporations and requires compliance with the Florida Constitution and general laws. The Florida Constitution says, in part:

> Neither the state nor any county, school district, municipality, special district, or agency of any of them, shall become a joint owner with, or stockholder of, or give, lend or use its taxing power or credit to aid any corporation, association, partnership or person ...

Art. VII, § 10, Fla. Const.

79. Despite the prohibitions, Parrish holds investments in two corporate entities selling health care services to patients inside and outside its legislatively-set geographic boundaries.

80. LHCG LXXXII, LLC ("LHCG"), a hospice and home health care company, operates in Brevard County as Parrish Home Health Care ("PHHC"). LHCG is a subsidiary of LHC Group Inc. ("LHC Group") of Lafayette, Louisiana, a national provider of in-home healthcare services with operations in thirty-seven states and 30,000 employees.

81. LHC Group advertises itself as the "preferred in-home healthcare partner for more than 400 leading hospital around the country." In 2021, LHC Group recorded $2.1 billion in revenue and net income of $111.6 million.

82. According to Florida health care records, NBMS is identified as a 25 percent owner of LHCG, along with LHC Health Care Group of Florida LLC, another subsidiary of LHC Group, which owns 75 percent of the company.

83. NBMS was created "solely to benefit and further the interests of the District through physician recruitment and the provision of medical goods and services." Parrish pays millions of dollars to subsidize NBMS's operations.

84. PHHC operates in numerous locations in Brevard County, including its second largest city, Melbourne, Florida.

85. Melbourne is outside the geographic boundaries of Parrish.

86. Defendant Mikitarian described Parrish's investment in a second for-

profit company, MedFast Urgent Care Centers, to Relator. MedFast runs the largest urgent care network in Brevard County. Its fourteen centers span the county, operating both inside and outside the geographic boundaries of Parrish. MedFast has three centers in Melbourne alone.

87. Parrish spent $1.1 million on a 7,000-square-foot-urgent-care facility on Port St. John Parkway in a venture with MedFast Urgent Care Centers LLC. Dr. David Williams, a MedFast partner, said at the time the company would like to be the "McDonald's of urgent-care medicine- serve it fast and efficiently."

88. Since the venture with Parrish was announced, MedFast has built twelve facilities across the county and has announced plans for two more.

***ii. The AHCA's Office of the Inspector General's Investigation***

89. The AHCA OIG investigated the AHCA's role in the interlocal agreements and issued a report of its findings on January 16, 2024.

90. The AHCA OIG could not definitively conclude that either the AHCA or CMS approved inter-hospital transfers of unused federal funds prior to DY 9 and allow hospitals to redistribute unusable LIP funds among each other to avoid repayment. The AHCA OIG found that the testimony obtained during its investigation indicated that CMS's approval "**<u>may</u> have only been verbal[]**" but that no documentary evidence was provided to confirm this statement. (emphasis added).

91. Additionally, the AHCA OIG was not presented with any evidence from the Bureau of Medicaid Program Finance ("MPF") of the alleged LIP overpayment to neither Halifax nor Parrish for DY 9. According to the MPF, LIP payments made to

Halifax and PMC for DY 9 indicated they both were within their cost allocation limits and neither received an overpayment of LIP funding for DY 9.

92. The AHCA OIG found that while staff members received the interlocal agreements in 2017 and 2019, there were no further MPF documents available to corroborate the redistribution arrangements for DY 9.

93. The AHCA OIG's ultimate finding was that the allegations that certain AHCA employees redistributed the LIP funds between hospital taxing districts in violation of CMS guidelines is "unsubstantiated," which AHCA OIG defines as an "[i]Investigative finding indicating the condition that existed for the investigators disclosed a lack of relevant and material evidence to conclusively prove **or** disprove the allegations." (emphasis added). In other words, the findings were inconclusive.

94. Even so, the AHCA OIG's official recommendation was that MPF should reconcile LIP payments to Halifax and Parrish beginning after DY 9 and moving forward to ensure no Federal Financial Participation was impacted.

**B. Parrish's Stark Law Violations**

i. ***Parrish Offers Illegal Remuneration to Physicians***

95. Parrish owns and operates several subsidiaries, including PMG which employs primary care and specialty physicians, in the State of Florida. For at least the last seven years, Parrish, which has not raised taxes in more than twenty-five years, has experienced financial difficulties with annual losses of more than $8 million.

96. In an effort to increase revenue, Parrish entered into improper compensation arrangements and other arrangements that violate the Stark Law,

include arrangements that (1) exceeded fair market value; (2) were not commercially reasonable; or (3) took into account the value or volume of referrals or other business generated.

97. Parrish ignored the requirements set out by the Stark Law and paid compensation to numerous doctors that far exceeded prevailing standards. Parrish knew the salaries were excessive and knew that Parrish would lose money on certain physician practices because of those salaries. It justified the exorbitant salaries by tracking downstream revenue in the form of physician referrals and each doctor's contribution margin to the bottom line.

98. By 2018, Parrish intensified efforts to direct referrals to the PMC, its specialists, and its affiliates in order to stop what they deemed "outmigration," or the practice of referring patients outside the Parrish network. Parrish's estimated loss of these lucrative referrals was $4 million per year.

99. In April 2019, the Director of Operations at PMG, Gregg Sargent, notified staff that outmigration of patient cases needed to change. In an April 5, 2019 email, Sargent wrote:

> "I have been given a directive to help reduce the outmigration of patient cases. In the last 12 months there has been over 4 million in total value of referrals outside of our network. This has got to change if we are going to improve the financial health of our group. Referrals outside of the network should only occur if insurance dictates."

100. Sargent's email listed the Parrish in-network providers for five key practices: cardiology, orthopedics, gastroenterology, ophthalmology and urology. The reports break down the referrals inside and outside the network by doctor. After

capital contributions, Parrish lost more than $53 million from 2014 through 2019, reducing its net position.

***ii. PMC Physicians Express Concerns over the Referral Directive***

101. Soon thereafter, PMC began to feel the consequences of the referral directive. In May 2019, one physician quit rather than submit to the directives.

102. On May 10, 2019, Parrish physician, Ben Nettleton, DO, emailed Mikitarian requesting a meeting, which never occurred, to negotiate a "fair" contract amid questions over the referral practices:

> "I recognize Parrish is trying to stay afloat financially, but I believe I do not wish to become the physician Parrish and Omni are trying to force me to become. If I stay in your system there will continue to be distracting strife and dissonance.
>
> If you want or need someone who will bend referrals to your will, I may not be that physician as well. I have an obligation to do what is best for my patients, and I am still learning the specialists, but please note that I do not maliciously re-route patients out of your network unless requested by the patient or if! believe it is in the best interest of the patient to do so."

103. In his email, Dr. Nettleton defended his medical judgement with a point-by-point defense of his decisions to refer outside the Parrish network. Many of his patients, he wrote, live too far away to travel to the PMC for treatment. He added:

> "Cardiology- Dr. Rao. [A physician outside the Parrish network] This is the big one. I stopped going out of my way to send patients to him in July 2018, even though I feel he is a good cardiologist, because so is Dr. Matthews and I have no reason to not utilize him. However, many patients are established with Dr. Rao already, and others request him, and I cannot conscientiously re-route those when I do not believe it is in the best interest of the patient to do so.

104. One hour after Dr. Nettleton's email, Mikitarian informed Relator that

refused to meet with Dr. Nettleton and subsequently sent Dr. Nettleton an email accepting his resignation. Regarding Dr. Nettleton, Mikitarian wrote to Relator that "[t]he guy is a lunatic."

***iii. Enforcement of the Referral Directive***

105. PMC physician contracts emphasized the new referral policies. For example, a draft agreement for E. Wayne Mosley, M.D., an orthopedic surgeon, said:

> "Physician shall exclusively utilize Hospital, its subsidiaries and affiliates, including but not limited to Parrish Health Network for the provision of the services referenced herein, as well as all related ancillary and other services that Physician may order in connection therewith, except in any of the following circumstances:
>
> - The patient expresses a preference for a different provider or supplier; after physician has indicated their exclusive use of Hospital services
> - The patient's insurance determines the provider or supplier
> - In physician's judgment, doing so would not be in the patient's best medical interests."

106. The agreement explains that the contract provision "shall not be construed" to require the physician to refer patients to PMC, its subsidiaries or affiliates. However, doctors were acutely aware that they were to refer patients to Parrish's pre-approved providers.

107. Parrish regularly tracked referrals, the revenue generation of its employed physicians, and the physicians' "contribution margin," or the sum of net payments minus direct costs. It then input the contribution margin by specialty into a referral management tool to calculate the value of "leakage."

108. Aggregated reports showed the "Leakage Trends" by practice and by

month, the reason for the referral, the top out-of-network providers, and the Parrish alternatives. From April 2018 through March 2019, one of Parrish's consultants estimated that the out migration totaled $4.7 million. Out-of-network providers received between 26 percent and 29 percent of all Parrish patient referrals.

109. Cardiovascular services, for example, referred 398 patients outside the Parrish network. Cardiologists did not provide a reason for the referral for 274 of the patients. Parrish estimated that the referral value was $1.2 million. A second practice, Orthopedics, placed 241 patients with out-of-network providers at an estimated value of $851,041.

110. Detailed reports broke out the number of referrals by doctor and listed the percentage directed toward other providers. Income reports tracked revenue and direct expenses by physician and the practice, but did not include the downstream revenue accrued by the 210-bed PMC.

111. A management company, hired by Parrish to help improve Parrish's financial position, questioned the sustainability of the arrangement with Dr. Mosley.

112. The income report for the Neurology/Orthopedics practice headed by Dr. Mosley, whose productivity was in the 10th percentile, shows a substantial loss nearly equal to his salary. The report reflects a net operating loss of $591,472 for Dr. Mosley and a loss of $1.1 million for the practice. The report lists the contractual obligation to Dr. Mosley at $522,168.

113. Parrish budgeted for its practices to lose money. Overall, it planned for a $1.4 million loss through February 2019. The actual loss was $1.6 million, largely

due to excessive compensation paid to physicians.

114. The Stark Law and related regulations provide exceptions to the requirements for certain compensation arrangements only, including bona fide employment relationships, personal services arrangements, fair market value arrangements, and indirect compensation relationships. To qualify for these exceptions, these arrangements must meet these statutory requirements:

- Remuneration must be at fair market value and not based on the value or volume of referrals; and
- Remuneration would be commercially reasonable even in the absence of referrals from the physician to the hospital.

42 U.S.C. §§ 1395nn(e)(2)(B) and (e)(2)(C).

115. Parrish knowingly made decisions to pay its physicians a compensation in excess of fair market value, taking into account the value or volume of services generated to Parrish from referrals. They selectively ignored losses and other factors that rendered these contracts commercially unreasonable to maintain revenue generated from patient referrals.

116. From 2017-2021, OMNI managed the PMG. Its duties included evaluating the medical needs of the community, communicating with employees and doctors, and recruiting physicians. During PMG's internal meetings, employees and physicians frequently complained about the service provided by cardiologists in North Brevard.

117. Despite the staff's complaints and a documented need for additional service providers, Parrish denied OMNI and PMG's request to recruit and hire

additional heart specialists. In fact, Parrish revoked or refused to renew the medical privileges of at least four cardiologists over the last decade.

118. Upon Relator's information and belief, the decision to not recruit or hire cardiologists was based on an "arrangement" between Parrish and certain existing cardiology practices in North Brevard.

119. Some of these practices were paid to refer their patients to the PMC. Parrish purchased the nuclear medicine equipment from one cardiology group, which then assigned their employees to Parrish and referred all of their nuclear studies and patients to Parrish's health care system and PMG. At approximately the same time, one of those cardiology groups' members, Biju Mathews, M.D., received a medical directorship engineered by Parrish.

**C. Parrish Defendants Misappropriate CARES Act Funding**

120. Through the Fund, Brevard County (the "County") was one of the eligible local government subrecipients of CARES Act funding, receiving a total of $105 million.

121. According to the Treasury, all recipients of these funds were required to comply with subsection 601(d) of the Social Security Act ["SSA"], as amended, (42 U.S.C. 801(d))" and "maintain and make available to the Treasury OIG upon request all documents and financial records sufficient to establish compliance with [this] subsection[.]"

122. Section 601(d) of the SSA only permits CARES Act fund payments for costs associated with necessary expenditures related to COVID-19, those not

accounted for in the most recently approved budget as of the date of the statute's enactment, and costs incurred only after March 1, 2020. The Treasury also noted that the Fund bars recipients from using the payments to cover expenditures for which they have or will receive reimbursement from another source of funding, including other federal programs like Medicare and Medicaid.

123. During all relevant times, the County was an "eligible local government" that was required to comply with, and submit to, the reporting requirements above as a condition of receipt of the funds.

124. The County's Board of County Commissioners ("County Board") was tasked with allocating the CARES Act funds as it deemed appropriate. Brevard County was required to refund any money that did not follow federal spending rules.

125. Initially, Parrish received a total of $10.4 million in federal grants and $15.7 million in advanced payments from Medicare intended to allow the hospital system to keep its doors open and operational during the COVID-19 pandemic. Only a few months later, on November 5, 2020, Parrish executive, Edwin Loftin, attended a County Board public workshop regarding CARES Act funding and lobbied the County Board for Parrish to receive an additional $5 million in funding. Loftin represented that the funds would be used, in part, to expand and remodel the emergency room, create a stand-alone respiratory care area, HVAC updates, and implement automations throughout the facilities.

126. When the County Board voted to deny Parrish's $5 million request, Commissioner Rita Pritchett moved to circumvent the "no" vote by moving to allocate

$5 million of the county's CARES Act funds for each of the county's five commissioners to spend on any project the commissioner deemed appropriate, provided the project was deemed "low-risk" and "COVID-19 related."

127. The $25 million slush fund accounted for almost one quarter of the county's entire allocation. Commissioner Pritchett, whose direct constituent is Parrish, allocated her $5 million allocation to Parrish before her motion was approved.

128. Parrish received a total of $11.8 million in CARES Act funds in addition to the $5 million funneled to Parrish by Commissioner Pritchett.

129. Parrish agreed to comply with subsection 601(d) of the SSA, including restrictions on the use of the CARES Act funds, through an agreement with the County Board, which provides:

> (a) are necessary expenditures incurred due to the public health emergency with respect to COVID-19;
> (b) were not accounted for in the Hospital's Budget most recently approved as of March 27, 2020; and
> (c) were or will be incurred during the period that began on March 1, 2020, and ends on December 30, 2020. The expense is incurred when the County has expended the funds to cover the expense or reimbursed the Hospital for the expense.

130. Parrish defrauded the Government by requesting, receiving, and improperly retaining CARES Act funds, as a subrecipient, which were used for improper purposes, while falsely certifying compliance with CARES Act regulations.

131. For example, after receiving the additional $5 million from the Fund, Parrish announced plans to convert the existing Parrish Health & Fitness Center into an orthopedic and sports performance center of excellence. The plan required moving

the 5,500-foot fitness center to a new location that was said to open in the fall of 2021.

132. County payment records do not show CARES Act expenditures for the gym. However, the records show $142,000 in monies owed to the facility's management company. Parrish supplied documentation to the County Board showing individual invoices of $87,000 and $85,000 for estimated payroll and management fees. These fees were not related to COVID-19 but rather were reoccurring expenses which were accounted for prior to March 1, 2020.

133. In another example, the County reimbursed Parrish for a certain COVID-19 medication, Remdesivir, under the "Personal Protective Equipment" category, even though public and private insurers will reimburse for treatments using the drug.

134. Further, Parrish received over $3.2 million from the County-administered Fund to pay for COVID-19 testing that was *already* covered by government insurance plans, including Medicare and Medicaid, and private insurers.

135. Additionally, Parrish used CARES Act funds to pay for a leased medical facility that was closed to the public *before* the COVID-19 public health emergency was announced in March 2020. Upon information and belief, the previous rental payments were accounted for in Parrish's budget.

136. Parrish also used CARES Act funds to reimburse payroll expenses that were already accounted for in the 2020 budget.

137. Parrish used CARES Act payments to fund certain capital improvement projects which were not "temporary public medical facilities" and whose need did not necessarily arise due to the pandemic. Construction to remodel and build certain

"emergency" isolation units at PMC were not completed until late December 2021. In 2021, Parrish already recouped over $320,000 for equipment to operate "temporary" isolation rooms. However, during that same period, the Fund paid over $545,000 for "emergency" remodeling to existing patient rooms. For example, the CARES Act paid for "renovat[ion of] Old Rehab-Cabinetry tear out" and removal of carpeting to make way for new flooring as well as replacement of drywall and painting.

138. In addition to these inappropriately expended funds, on information and belief, relator believes Parrish used other CARES Act funding contrary to the regulations and prohibitions prescribed by the Government as a condition of receipt of CARES Act funding, including but not limited to improper equipment purchases and using CARES Act funds to secure lines of credit.

**D. Parrish Defendants Retaliate against Relator and OMNI for Whistleblowing**

139. The FCA's anti-retaliation provision provides:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h).

140. Beginning June 2021, Relator (simultaneously, through Relator as its principal) alerted Parrish executives, including Mikitarian, Jackson, Jordan and then-Chief Financial Officer, Kent Bailey, of FCA-related concerns. After raising issues of potential FCA violations, Relator uncovered the evidence, as described herein, that

Parrish received improper payments through the LIP Program and CARES Act.

141. Relator attempted to provide evidence documenting the fraud to Mikitarian, Jackson, Jordan, and Kent, who ignored Relator's concerns.

142. Rather than investigate the concerns, Parrish Defendants retaliated against Relator for his revelations. Parrish Defendants blocked OMNI's staffs' emails and terminated Relator and OMNI's contracts and leases.

143. When senior officials at Parrish refused to take action, Deligdish brought the matter to the attention of the AHCA and HHS OIG on June 27, 2021, and Relator was granted whistleblower status under Fla. Stat. §112.3187.

144. The ongoing retaliation extended beyond mere termination of Parrish Defendants' contractual relationship with Relator and OMNI.

145. Parrish Defendants also retaliated by filing lawsuits against Relator and OMNI. Mikitarian sued Relator and OMNI for defamation, alleging that Relator, OMNI, and a third defendants, Frank Harrison, wrongfully accused Mikitarian and the remaining Parrish Defendants of fraud, conspiracy, and violations of the FCA. Mikitarian also alleged that Harrison, the third defendant, is a fraudulent alias used or controlled by Relator. The lawsuit was dismissed with prejudice after a hearing on January 13, 2022.

146. In addition, starting April 27, 2022, Parrish Defendants began leveraging their working relationship with the University of Central Florida College of Medicine ("UCF") and commenced a series of communications with UCF in order to have Relator's faculty appointment terminated. These unprovoked communications came

two full years after Parrish Defendants terminated any contractual relationship with Relator and OMNI and were designed exclusively to tarnish Relator's reputation in the medical community. Parrish Defendants were successful in their retaliation, as UCF terminated Relator's faculty appointment on June 6, 2022.

147. Further, Relator became aware of Parrish Defendants' threats to have him arrested and prosecuted, as indicated in Parrish Defendants' counsel's March 8, 2023 correspondence to the Florida State Attorney and Titusville Police Department Chief calling for pursuit of criminal charges against Relator.

148. Parrish Defendants' retaliatory conduct against Relator occurred after Relator's efforts to disclose substantial fraud committed by Parrish against government programs. Relator's attempt to alert Parrish Defendants to the fraud resulted in termination of contracts worth millions of dollars and substantial legal expenses incurred by Relator and OMNI, which were used to fight the arbitrary and capricious actions taken against them.

## COUNT I

## VIOLATION OF THE FALSE CLAIMS ACT
## 31 U.S.C. § 3729(A)(1)(A)
## (ALL DEFENDANTS – LIP)

149. Relator realleges and incorporates paragraphs 1, 4 through 27, 33 through 47, and 53 through 94 of the Second Amended Complaint as if fully set forth herein.

150. This is an action under the False Claims Act, § 3729(a)(1)(A).

151. As described above, Defendants knowingly presented or caused to be

presented false or fraudulent claims for payment or approval by the Government, in violation of 31 U.S.C. § 3729(a)(1)(A).

152. As set forth herein, Defendants knowingly used two separate interlocal agreements to avoid an obligation to return excess funds to the Government, and used those excess payments in a manner that did not conform with LIP guidelines.

153. The Government, unaware of the falsity of the records, statements and claims presented, or caused to be presented by Defendants for approval, issued payments to Defendants that it would have paid but for Defendants' unlawful conduct.

154. By reason of the acts and conduct of Defendants in violation of 31 U.S.C. § 3729(a)(1)(A), the United States has suffered actual damages, including the total amount paid in response to all such false and fraudulent claims for payment. In addition, the United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

## COUNT II

### VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(A)(1)(B)
### (ALL DEFENDANTS – LIP)

155. Relator realleges and incorporates paragraphs 1, 4 through 27, 33 through 47, and 53 through 94 of the Second Amended Complaint as if fully set forth herein.

156. This is an action under the False Claims Act, § 3729(a)(1)(B).

157. As described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim

submitted to and paid by the Government in violation of 31 U.S.C. § 3729(a)(1)(B).

158. Defendants knowingly used two separate interlocal agreements to avoid an obligation to return excess funds to the Government, and used those excess payments in a manner that did not conform with LIP guidelines.

159. By reason of the acts and conduct of Defendants in violation of 31 U.S.C. § 3729(a)(1)(B), the United States has suffered actual damages, including the total amount paid in response to all such false and fraudulent claims for payment. In addition, the United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

## COUNT III

## CONSPIRING TO COMMIT A VIOLATION OF THE FALSE CLAIMS ACT
## 31 U.S.C. § 3729(A)(1)(C)
## (ALL DEFENDANTS – LIP)

160. Relator realleges and incorporates paragraphs 1, 4 through 27, 33 through 47, and 53 through 94 of the Second Amended Complaint as if fully set forth herein.

161. The False Claims Act makes it a violation under 31 U.S.C. § 3729(a)(1)(C) to "conspire[] to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)."

162. As described above, Defendants conspired to commit a violation of 31 U.S.C. § 3729(a)(1)(A), (B), and (G).

163. Defendants' conduct satisfies the elements of a conspiracy sufficient to result in False Claims Act liability, as: (1) an agreement existed between the

Defendants to have false or fraudulent claims allowed or paid to the government, (2) the Defendants each joined that agreement, and (3) one or more of the Defendants knowingly committed one or more overt acts in furtherance of the object of the conspiracy.

164. Two agreements existed between Defendants to submit false claims to the government and avoid their obligation to return funds to the federal Government, as described above and as evidenced by the 2017 Agreement and 2019 Agreement.

165. By reason of the acts and conduct of Defendants in violation of 31 U.S.C. § 3729(a)(1)(C), the United States has suffered actual damages, including the total amount paid in response to all such false and fraudulent claims for payment. In addition, the United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

## COUNT IV

## VIOLATION OF THE FALSE CLAIMS ACT
## 31 U.S.C. § 3729(A)(1)(G)
## (ALL DEFENDANTS – LIP)

166. Relator realleges and incorporates paragraphs 1, 4 through 27, 33 through 47, and 53 through 94 of the Second Amended Complaint as if fully set forth herein.

167. Defendants had a duty under federal law to return excess LIP payments to the State of Florida, which was then obligated to refund the federal share of those excess payments to the federal government through CMS. See July 10, 2015 RFMD.

168. A defendant that "knowingly conceals or knowingly and improperly

avoids or decreases an obligation" to return funds to the federal Government is liable under the False Claims Act. 31 U.S.C. § 3729(a)(1)(G).

169. Defendants made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

170. As described above, Defendants knowingly used the 2017 Agreement and 2019 Agreements to avoid obligations to return excess LIP payments to the Government.

171. Defendants improperly retained such excess payments with actual knowledge of the legal obligation to return the funds to the Government.

172. By reason of Defendants' knowing and improper retention of the overpayments described herein, the United States has suffered damages in an amount to be determined at trial and is entitled to recover treble damages plus a civil penalty for each false claim.

173. By reason of the acts and conduct of Defendants in violation of 31 U.S.C. § 3729(a)(1)(G), the United States has suffered actual damages, including the total amount paid in response to all such false and fraudulent claims for payment. In addition, the United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

**COUNT V**

**VIOLATION OF THE FLORIDA FALSE CLAIMS ACT**
**FLA. STAT. § 68.081 *ET SEQ***
**(ALL DEFENDANTS – LIP)**

174. Relator realleges and incorporates paragraphs 1, 4 through 27, 33 through 47, and 53 through 94 of the Second Amended Complaint as if fully set forth herein.

175. The Florida False Claims Act mirrors the federal False Claims Act and is subject to the same pleading standard. Relatedly, conclusions as to the federal False Claims Act apply equally to the Florida False Claims Act because the Florida version mirrors the federal False Claims Act.

176. Thus, the allegations and claims against Defendants in this Second Amended Complaint, including Counts I-III, also state claims for which relief may be granted pursuant to the Florida False Claims Act, Fla. Stat. §§ 68.081-68.09, and specifically Fla. Stat. § 68.082(2)(a-c);(g).

177. This Court has jurisdiction pursuant to 31 U.S.C. § 3732(b) because the claims under state law arise from the same transactions or occurrences at issue in the other Counts stated in this Second Amended Complaint.

178. By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Florida for payment or approval in violation of Fla. Stat. § 68.082(2)(a).

179. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts,

to induce the State of Florida to approve and pay such false and fraudulent claims in violation of Fla. Stat. § 68.082(2)(b).

180. By virtue of the acts described above, Defendants, their agents, employees, and other co-conspirators knowingly conspired to commit a violation of Fla. Stat. § 68.082(2) in violation of Fla. Stat. § 68.082(2)(c).

181. By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the State of Florida in violation of Fla. Stat. § 68.082(2)(g).

182. The State of Florida, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by MD Labs & Owners, paid and continues to pay the claims that would not be paid but for MD Labs & Owners' unlawful conduct.

183. By reason of the acts and conduct of the Defendants, in violation of Fla. Stat. §§ 68.081, the State of Florida has suffered actual damages, including the total amount paid in response to all such false and fraudulent claims for payment. In addition, the State of Florida is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

## COUNT VI

### VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(A)(1)(A)
### (PARRISH DEFENDANTS – CARES ACT)

184. Relator realleges and incorporates paragraphs 1 through 3, 6 through 27, 48 through 52, and 120 through 138 of the Second Amended Complaint as if fully set forth herein.

185. This is an action under § 3729(a)(1)(A) of the False Claims Act and under CARES Act funding recipient requirements. In exchange for receiving the funds, all CARES Act recipients and subrecipients certify and agree that they will not use the funds to reimburse previously budgeted expenses or expenses or that have been reimbursed from other sources or that other sources are obligated to reimburse. Further, if capital improvement projects are not necessary expenditures due to the COVID-19 public health emergency, recipients agree that the funds may not be used for such projects.

186. At all times relevant to this case, Parrish Defendants had actual knowledge, or acted in deliberate ignorance or in reckless disregard, of their improper draw and subsequent use of CARES Act funds in violation of established Government regulations and qualifying certifications for receipt of CARES Act funding.

187. Parrish Defendants, as subrecipients of the funds, knowingly presented or caused to be presented false or fraudulent claims for payment or approval by the Government through the CARES Act, in violation of 31 U.S.C. § 3729(a)(1)(A).

188. As described above, Parrish Defendants knowingly falsely certified

compliance with CARES Act regulations, in violation of the False Claims Act, to draw upon CARES Act funds with the intention to utilize the funds for unauthorized capital projects, previously budgeted expenses, otherwise already reimbursable expenses, and other uses not permitted by CARES Act restrictions.

189. By reason of the acts and conduct of Parrish Defendants in violation of 31 U.S.C. § 3729(a)(1)(A), the United States has suffered actual damages, including the total amount paid in response to all such false and fraudulent claims for payment. In addition, the United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

## COUNT VII

## VIOLATION OF THE FALSE CLAIMS ACT
## 31 U.S.C. § 3729(A)(1)(B)
## (PARRISH DEFENDANTS – CARES ACT)

190. Relator realleges and incorporates paragraphs 1 through 3, 6 through 27, 48 through 52, and 120 through 138 of the Second Amended Complaint as if fully set forth herein.

191. This is an action under § 3729(a)(1)(B) of the False Claims Act and under CARES Act funding recipient requirements. In exchange for receiving the funds, all CARES Act recipients certify and agree that they will not use the funds to reimburse previously budgeted expenses or expenses or that have been reimbursed from other sources or that other sources are obligated to reimburse. Further, if capital improvement projects are not necessary expenditures due to the COVID-19 public health emergency, recipients agree that the funds may not be used for such projects.

192. At all times relevant to this case, Parrish Defendants had actual knowledge, or acted in deliberate ignorance or in reckless disregard, of their improper draw and subsequent use of CARES Act funds in violation of established Government regulations and qualifying certifications for receipt of CARES Act funding.

193. Parrish Defendants, as subrecipients of the funds, knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claims for payment or approval by the Government through the CARES Act, in violation of 31 U.S.C. § 3729(a)(1)(B).

194. As described above, Parrish Defendants knowingly presented false certifications of compliance with CARES Act regulations, in violation of the False Claims Act, to draw upon CARES Act funds with the intention to utilize the funds for unauthorized capital projects, previously budgeted expenses, otherwise already reimbursable expenses, and other uses not permitted by CARES Act restrictions.

195. By reason of the acts and conduct of Parrish Defendants in violation of 31 U.S.C. § 3729(a)(1)(B), the United States has suffered actual damages, including the total amount paid in response to all such false and fraudulent claims for payment. In addition, the United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

## COUNT VIII

## CONSPIRACY TO COMMIT A VIOLATION OF THE FALSE CLAIMS ACT 31 U.S.C. § 3729(A)(1)(C) (PARRISH DEFENDANTS – CARES ACT)

196. Relator realleges and incorporates paragraphs 1 through 3, 6 through 27,

48 through 52, and 120 through 138 of the Second Amended Complaint as if fully set forth herein.

197. The False Claims Act makes it a violation under 31 U.S.C. § 3729(a)(1)(C) to "conspire[] to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)."

198. As asserted above, Parrish Defendants conspired to commit a violation of 31 U.S.C. § 3729(a)(1)(A), (B), and (G).

199. Parrish Defendants' conduct satisfies the elements of a conspiracy sufficient to result in False Claims Act liability, as: (1) an agreement existed between the Defendants to have false or fraudulent claims allowed or paid to the government, (2) the Defendants each joined that agreement, and (3) one or more of the Defendants knowingly committed one or more overt acts in furtherance of the object of the conspiracy.

200. Parrish Defendants conspired to commit violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C), by knowingly making and submitting false claims to the Government for payment or approval through the CARES Act when they obtained CARES Act funds that were used for expressly impermissible purposes.

201. By reason of the acts and conduct of Parrish Defendants in violation of 31 U.S.C. § 3729(a)(1)(C), the United States has suffered actual damages, including the total amount paid in response to all such false and fraudulent claims for payment. In addition, the United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

## COUNT IX

### VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(A)(1)(G)
### (PARRISH DEFENDANTS – CARES ACT)

202. Relator realleges and incorporates paragraphs 1 through 3, 6 through 27, 48 through 52, and 120 through 138 of the Second Amended Complaint as if fully set forth herein.

203. Parrish Defendants violated the "reverse false claim" statute, 31 U.S.C. § 3729(a)(1)(G), as they (1) knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or (2) knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

204. In exchange for receiving the funds, all CARES Act recipients certify and agree that they will not use the funds to reimburse previously budgeted expenses or expenses or that have been reimbursed from other sources or that other sources are obligated to reimburse. Further, if capital improvement projects are not necessary expenditures due to the COVID-19 public health emergency, recipients agree that the funds may not be used for such projects.

205. At all times relevant to this case, Parrish Defendants had actual knowledge, or acted in deliberate ignorance or in reckless disregard, of their improper draw and subsequent use of CARES Act funds in violation of established Government regulations and qualifying certifications for receipt of CARES Act funding.

206. Parrish Defendants, as subrecipients of the funds, owed a duty under the CARES Act to certify compliance with all federal regulations, including those prescribed by the CARES Act and 42 U.S.C. § 1320a-7k.

207. Pursuant to 42 U.S.C. § 1320a-7k, Parrish was required to report and return any overpayments made by the Government under the CARES Act to the Government within 60 days of the date on which the overpayments were identified.

208. Through their knowing failure to report and return each overpayment of CARES Act funds to the Government, Parrish violated 31 U.S.C. § 3729(a)(1)(G) when they drew upon and used CARES Act funds for expressly impermissible purposes.

209. By reason of the acts and conduct of Parrish, in violation of 31 U.S.C. § 3729(a)(1)(G), the United States has suffered actual damages, including the total amount paid in response to all such false and fraudulent claims for payment. In addition, the United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

**COUNT X**

**VIOLATION OF THE FALSE CLAIMS ACT,**
**31 U.S.C. § 3729(A)(1)(A), AND THE STARK LAW, 42 U.S.C. § 1395NN**
**(PARRISH)**

210. Relator realleges and incorporates paragraphs 1, 3, 6-7, 22 through 32, and 95 through 119 of the Second Amended Complaint as if fully set forth herein.

211. This is an action under § 3729(a)(1)(A) of the False Claims Act and under § 1395nn of the Stark Law. Compliance with the Stark Law is a condition of payment

of all reimbursement claims submitted to Medicare, Medicaid, and other federally funded programs. Claims submitted or caused to be submitted in violation of the Stark Law are false claims.

212. The Stark Law makes it unlawful to compensate referring physicians based on the value and volume of referrals for designated health services, by paying physicians commercially unreasonable compensation in exchange for referrals.

213. Parrish violated the Stark Law when it paid physicians salaries that exceeded fair market value and entered into exclusive self-referral arrangements in exchange for compensating physicians in excess of fair market value based on the value of volume of their referrals.

214. Following the implementation of the referral program designed to stop "outmigration," Parrish violated the Stark Law, thereby knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval by the United States in violation of 31 U.S.C. § 3729(a)(1)(A).

215. Parrish's payment of salaries to its physicians was based on the volume and value of the physicians' Medicare referrals.

216. Parrish's payments of physician salaries far exceeded fair market value and this scheme was designed to elicit the physicians' future Medicare referrals under the self-referral program designed to stop "outmigration."

217. The United States paid such false or fraudulent claims because of the acts of Parrish Defendants.

218. By reason of the acts and conduct of Parrish, in violation of 31 U.S.C. §

3729(a)(1)(A) and 42 U.S.C. § 1395nn, the United States has suffered actual damages, including the total amount paid in response to all such false and fraudulent claims for payment. In addition, the United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

## COUNT XI

## VIOLATION OF THE FALSE CLAIMS ACT 31 U.S.C. § 3729(A)(1)(B), AND THE STARK LAW, 42 U.S.C. § 1395NN (PARRISH)

219. Relator realleges and incorporates paragraphs 1, 3, 6-7, 22 through 32, and 95 through 119 of the Second Amended Complaint as if fully set forth herein.

220. This is an action under § 3729(a)(1)(B) of the False Claims Act and under § 1395nn of the Stark Law. Compliance with the Stark Law is a condition of payment of all reimbursement claims submitted to Medicare, Medicaid, and other federally funded programs. Claims submitted or caused to be submitted in violation of the Stark Law are false claims.

221. The Stark Law makes it unlawful to compensate referring physicians based on the value and volume of referrals for designated health services, by paying physicians commercially unreasonable compensation in exchange for referrals.

222. Parrish violated the Stark Law when it paid physicians salaries that exceeded fair market value and entered into exclusive self-referral arrangements in exchange for compensating physicians in excess of fair market value based on the value of volume of their referrals.

223. Following the implementation of the referral program designed to stop

"outmigration," Parrish violated the Stark Law, thereby knowingly making, using, or causing to be made or used, false records or statements materials to false or fraudulent claims for payment or approval by the United States in violation of 31 U.S.C. § 3729(a)(1)(B).

224. Parrish's payment of salaries to its physicians was based on the volume and value of the physicians' Medicare referrals.

225. Parrish's payments of physician salaries far exceeded fair market value and this scheme was designed to elicit the physicians' future Medicare referrals under the self-referral program designed to stop "outmigration."

226. The United States paid such false or fraudulent claims because of the acts of Parrish.

227. By reason of the acts and conduct of Parrish, in violation of 31 U.S.C. § 3729(a)(1)(B) and 42 U.S.C. § 1395nn, the United States has suffered actual damages, including the total amount paid in response to all such false and fraudulent claims for payment. In addition, the United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

## COUNT XII

### CONSPIRACY TO COMMIT A VIOLATION OF THE FALSE CLAIMS ACT 31 U.S.C. § 3729(A)(1)(C), AND THE STARK LAW, 42 U.S.C. § 1395NN (PARRISH)

228. Relator realleges and incorporates paragraphs 1, 3, 6-7, 22 through 32, and 95 through 119 of the Second Amended Complaint as if fully set forth herein.

229. This is an action under § 3729(a)(1)(C) of the False Claims Act and under

§ 1395nn of the Stark Law. Compliance with the Stark Law is a condition of payment of all reimbursement claims submitted to Medicare, Medicaid, and other federally funded programs. Claims submitted or caused to be submitted in violation of the Stark Law are false claims.

230. The Stark Law makes it unlawful to compensate referring physicians based on the value and volume of referrals for designated health services, by paying physicians commercially unreasonable compensation in exchange for referrals.

231. The False Claims Act makes it a violation under 31 U.S.C. § 3729(a)(1)(C) to "conspire[] to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)."

232. As asserted above, Parrish conspired with referring physicians to commit a violation of 31 U.S.C. § 3729(a)(1)(A) and (B)).

233. Parrish's conduct satisfies the elements of a conspiracy sufficient to result in False Claims Act liability, as: (1) an agreement existed to have false or fraudulent claims allowed or paid to the government, (2) Parrish joined that agreement, and (3) Parrish knowingly committed one or more overt acts in furtherance of the object of the conspiracy.

234. Through the implementation of the above-described self-referral program designed to stop "outmigration," Parrish violated the Stark Law when it paid physicians salaries that exceeded fair market value and entered into exclusive self-referral arrangements in exchange for compensating physicians in excess of fair market value based on the value of volume of their referrals. Thus, Parrish conspired to

commit a violation of 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(1)(B).

235. By reason of the acts and conduct of Parrish, in violation of 31 U.S.C. § 3729(a)(1)(C) and 42 U.S.C. § 1395nn, the United States has suffered actual damages, including the total amount paid in response to all such false and fraudulent claims for payment. In addition, the United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

## COUNT XIII

## VIOLATION OF THE FALSE CLAIMS ACT 31 U.S.C. § 3729(A)(1)(G), AND THE STARK LAW 42 U.S.C. § 1395NN (PARRISH)

236. Relator realleges and incorporates paragraphs 1, 3, 6-7, 22 through 32, and 95 through 119 of the Second Amended Complaint as if fully set forth herein.

237. Parrish violated the "reverse false claim" statute, 31 U.S.C. § 3729(a)(1)(G) as it (1) knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or (2) knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

238. At all times relevant to this case, Parrish had actual knowledge, or acted in deliberate ignorance or in reckless disregard, of the submission of claims from the referring physicians whose salaries exceeded market value and whose compensation was based upon the value and volume of their referrals.

239. As a result, Parrish owed a duty under the Medicare and Medicaid Programs to investigate all claims submitted by these physicians, identify, and refund

any "overpayments," or funds received or retained to which it was not entitled.

240. Pursuant to 42 U.S.C. § 1320a-7k, Parrish was required to report and return each overpayment to the United States within 60 days of the date on which it was identified.

241. Through its knowing failure to report and return each overpayment to the Government, Parrish violated 42 U.S.C. § 1395nn, when it paid the physicians salaries that exceeded fair market value based on the value and volume their referrals to Parrish.

242. By reason of the acts and conduct of Parrish, in violation of 31 U.S.C. § 3729(a)(1)(G), the United States has suffered actual damages, including the total amount paid in response to all such false and fraudulent claims for payment. In addition, the United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

## COUNT IX

## VIOLATION OF THE FALSE CLAIMS ACT ANTI-RETALIATION PROVISION, 31 U.S.C. § 3730(H), (PARRISH AND MIKITARIAN)

243. Relator realleges and incorporates paragraphs 1 through 148 of the Second Amended Complaint as if fully set forth herein.

244. The allegations and claims against the Parrish and Mikitarian in this Second Amended Complaint also state claims for which relief may be granted pursuant to the False Claims Act, 31 U.S.C. § 3730(h).

245. Parrish's and Mikitarian's conduct satisfies the elements for liability for

violating the anti-retaliation provision of the False Claims Act, as: (1) Relator engaged in lawful acts in furtherance of a False Claims Act action or endeavored to prevent at least one violation of the False Claims Act; and (2) Relator was, as a result, subjected to some form of discrimination in the terms and conditions of his employment.

246. Relator was OMNI's principal at all material times, and Relator and OMNI were employees and/or contractors within the meaning of 31 U.S.C. § 3730(h).

247. Relator engaged in protected conduct within the meaning of 31 U.S.C. § 3730(h). Specifically, Relator, individually and on behalf of OMNI, made repeated efforts to stop Parrish and Mikitarian from committing violations of the FCA, including but not limited to the efforts set forth in paragraphs 134 through 137, supra.

248. Parrish and Mikitarian knew Relator was engaged in actions in furtherance of an action under 31 U.S.C. § 3730 or to stop one or more violations of 31 U.S.C. § 3729 et seq.

249. As a result, Parrish and Mikitarian prematurely and pretextually terminated all existing contracts with Relator and OMNI, threatened to have Relator arrested and/or prosecuted, and interfered with Relator's reputation and professional prospects. These actions constituted unlawful discharge, harassment, and threats within the meaning of 31 U.S.C. § 3730(h).

250. By reason of the acts and conduct of Parrish and Mikitarian, in violation of 31 U.S.C. § 3730(h), Relator is entitled to all relief necessary to make him whole, including, but not limited to, compensatory damages, special damages for injury to his professional reputation and emotional distress sustained as a result of Parrish's and

Mikitarian's misconduct, injunctive relief prohibiting further acts of retaliation, and litigation costs and reasonable attorneys' fees.

**PRAYER**

WHEREFORE, Relator, on behalf of the United States and the State of Florida, respectfully requests that:

a. This Court enter an order determining that Defendants conspired to violate the federal False Claims Act and the Florida False Claims Act, and did violate the federal False Claims Act and the Florida False Claims Act, by making false statements and records to cause false claims to be submitted to the United States and the State of Florida;

b. This Court enter an order requiring Defendants to pay treble damages and the maximum civil penalties allowable to be imposed for each false or fraudulent claim presented to the United States and each false or fraudulent claim presented to the State of Florida;

c. This Court enter judgment against Parrish Defendants pursuant to 31 U.S.C. § 3730(h), including an award to Relator general and compensatory damages, two times the amount of back pay, interest on the back pay, lost profits, damages for mental pain and suffering, as well as litigation costs and reasonable attorney's fees;

d. This Court enter an order paying Relators the maximum statutory award for their contributions to the prosecution of this action;

e. This Court enter an order requiring Defendants to pay all expenses,

attorney's fees, and costs associated with this action; and

f. Any and all other relief this Court deems to be reasonable and just.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Relator hereby demands a trial by jury on all counts.

DATED: October 21, 2024

Respectfully submitted,

By: *<u>/s/ David B. Harrison</u>*

David B. Harrison (*pro hac vice)*
Svjetlana Tesic (*pro hac vice)*
SPIRO HARRISON & NELSON
363 Bloomfield Ave, Suite 2C
Montclair, New Jersey 07042
Tel: (973) 232-4109
Fax: (973) 509-9521
dharrison@shnlegal.com
stesic@shnlegal.com

*Lead Counsel for Relator*

Sean Estes (FL Bar. No. 55770)
Jesse Hoyer Estes (FL Bar No. 76934)
Hoyer Law Group, PLLC
2801 W. Busch Blvd., Suite 200
Tampa, Florida 33618
Tel.: 813-375-3700
Fax: 813-375-3710
sean@hoyerlawgroup.com
jesse@hoyerlawgroup.com

*Local Counsel for Relator*

**CERTIFICATE OF SERVICE**

I certify that on October 21, 2024, I electronically filed this document with the Clerk of the Court using CM/ECF. I also certify that this document is being served today on all counsel of record by transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ David B. Harrison*

David B. Harrison